# ZEMEL *v.* RUSK, SECRETARY OF STATE, ET AL.

No. 86.  Argued March 1, 1965.—Decided May 3, 1965.

1

2

*Leonard B. Boudin* argued the cause for appellant. With him on the briefs were *Victor Rabinowitz* and *Samuel Gruber*.

*Solicitor General Cox* argued the cause for appellees. With him on the brief were *Assistant Attorney General*

*Yeagley, Daniel M. Friedman, Bruce J. Terris, Kevin T. Maroney* and *Lee B. Anderson.*

*Edward J. Ennis* and *Melvin L. Wulf* filed a brief for the American Civil Liberties Union, as *amicus curiae,* urging reversal.

*Isidore Englander* and *Joseph Forer* filed a brief for Anatol Schlosser, as *amicus curiae.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The questions for decision are whether the Secretary of State is statutorily authorized to refuse to validate the passports of United States citizens for travel to Cuba, and, if he is, whether the exercise of that authority is constitutionally permissible. We answer both questions in the affirmative.

Prior to 1961 no passport was required for travel anywhere in the Western Hemisphere. On January 3 of that year, the United States broke diplomatic and consular relations with Cuba. On January 16 the Department of State eliminated Cuba from the area for which passports were not required, and declared all outstanding United States passports (except those held by persons already in Cuba) to be invalid for travel to or in Cuba "unless specifically endorsed for such travel under the authority of the Secretary of State." A companion press release stated that the Department contemplated granting exceptions to "persons whose travel may be regarded as being in the best interests of the United States, such as newsmen or businessmen with previously established business interests."

Through an exchange of letters in early 1962, appellant, a citizen of the United States and holder of an otherwise valid passport, applied to the State Department to have his passport validated for travel to Cuba as a tourist. His

request was denied. On October 30, 1962, he renewed the request, stating that the purpose of the proposed trip was "to satisfy my curiosity about the state of affairs in Cuba and to make me a better informed citizen." The request again was denied, on the ground that the purpose of the trip did not meet the previously prescribed standards for such travel.

On December 7, 1962, appellant instituted this suit against the Secretary of State and the Attorney General in the United States District Court for the District of Connecticut, seeking a judgment declaring: (1) that he was entitled under the Constitution and laws of the United States to travel to Cuba and to have his passport validated for that purpose; (2) that his travel to Cuba and the use of his passport for that purpose would not violate any statute, regulation, or passport restriction; (3) that the Secretary's restrictions upon travel to Cuba were invalid; (4) that the Passport Act of 1926 and § 215 of the Immigration and Nationality Act of 1952 were unconstitutional; (5) that the Secretary's refusal to grant him a passport valid for Cuba violated rights guaranteed him by the Constitution and the United Nations Declaration of Human Rights; and (6) that denial of the passport endorsement without a formal hearing violated his rights under the Fifth Amendment.[1] The complaint also requested that the Secretary be directed to validate appellant's passport for travel to Cuba and that the Secretary and the Attorney General be enjoined from interfering with such travel. In his amended complaint, appellant added to his constitutional attack on the 1926 and 1952 Acts a prayer that the Secretary and the Attorney General be enjoined from enforcing them.

On appellant's motion, and over the objection of appellees, a three-judge court was convened. On cross-

---

[1] This procedural claim was abandoned in the District Court and has not been urged here.

motions for summary judgment, the court, by a divided vote, granted the Secretary of State's motion for summary judgment and dismissed the action against the Attorney General, 228 F. Supp. 65 (D. C. D. Conn. 1964). We postponed consideration of the jurisdictional question to the hearing of the case on the merits, 379 U. S. 809.

## I.

A direct appeal to this Court from a district court lies under 28 U. S. C. § 1253 (1958 ed.) only "from an order granting or denying . . . an interlocutory or permanent injunction in any civil action, suit or proceeding required by any Act of Congress to be heard and determined by a district court of three judges." Thus we must deal first with the Government's contention that a three-judge court was improperly convened, for if the contention is correct, this Court lacks jurisdiction over the appeal. *Phillips* v. *United States*, 312 U. S. 246, 248.

Section 2282 of Title 28 of the United States Code requires the impanelling of a three-judge court in any case where the relief sought is "[a]n interlocutory or permanent injunction restraining the enforcement, operation or execution of any Act of Congress for repugnance to the Constitution of the United States . . . ." On its face, appellant's amended complaint, by calling upon the court below to enjoin the enforcement of the Passport Act of 1926 and § 215 of the Immigration and Nationality Act of 1952, on the ground that those statutes are unconstitutional, meets the requirements of § 2282. The Solicitor General notes that appellant would be accorded full relief by the voiding of the Secretary's order. It is true that appellant's argument—that either the Secretary's order is not supported by the authority granted him by Congress, or the statutes granting that authority are unconstitutional—is two-pronged. But we have often held that a

litigant need not abandon his nonconstitutional arguments in order to obtain a three-judge court: "the joining in the complaint of a nonconstitutional attack along with the constitutional one does not dispense with the necessity to convene such a court." [2]

The Solicitor General, apparently conceding—as all three judges below agreed—that appellant's Fifth Amendment attack is substantial, cf. *Kent* v. *Dulles,* 357 U. S. 116, 125; *Aptheker* v. *Secretary of State,* 378 U. S. 500, 505–506, argues that it is in reality an attack upon an administrative, as opposed to a legislative, policy, and therefore, under cases like *Phillips* v. *United States,* 312 U. S. 246, and *Ex parte Bransford,* 310 U. S. 354, a three-judge court need not have been convened. We need not evaluate this contention, for appellant's complaint also attacks the 1926 and 1952 Acts on the ground that "they contain no standards and are therefore an invalid delegation of legislative power." This allegation cannot be brushed aside as an attack upon the actions of the Secretary; in arguing invalid delegation, appellant has quite clearly assailed the statutes themselves. The Solicitor General therefore meets the delegation argument on another ground: by labeling it "frivolous." Although we do not accept appellant's delegation argument, *infra,* pp. 17–18, we cannot agree that it is so insubstantial as to compel a district court to read it out of the complaint and refuse to convene a three-judge court. Compare *William Jameson & Co.* v. *Morgenthau,* 307 U. S. 171; *Schneider* v. *Rusk,* 372 U. S. 224. Indeed, we explicitly noted in *Kent* v. *Dulles, supra,* at 129, that if we had held that the Secretary's refusal to issue a passport to petitioner in that case was supported by the 1926 and 1952 Acts, we would

---

[2] *Florida Lime Growers* v. *Jacobsen,* 362 U. S. 73, 80; see also *Allen* v. *Grand Central Aircraft Co.,* 347 U. S. 535; *Lee* v. *Bickell,* 292 U. S. 415; *Sterling* v. *Constantin,* 287 U. S. 378.

then have been obliged to consider whether those Acts were void for invalid delegation.[3]

The complaint therefore launches a substantial constitutional attack upon two federal statutes, and prays that their operation be enjoined. Cf. *Idlewild Liquor Corp. v. Epstein,* 370 U. S. 713, 715. We hold that the three-judge court was properly convened, and that we therefore have jurisdiction over the appeal.[4]

## II.

We think that the Passport Act of 1926, 44 Stat. 887, 22 U. S. C. § 211a (1958 ed.), embodies a grant of authority to the Executive to refuse to validate the passports of United States citizens for travel to Cuba. That Act provides, in pertinent part:

"The Secretary of State may grant and issue passports . . . under such rules as the President shall

---

[3] See also *Douglas* v. *Noble,* 261 U. S. 165.

[4] The convening of a three-judge court in this case surely coincides with the legislative policy underlying the passage of § 2282:

"The legislative history of § 2282 and of its complement, § 2281 . . . indicates that these sections were enacted to prevent a single federal judge from being able to paralyze totally the operation of an entire regulatory scheme, either state or federal, by issuance of a broad injunctive order. . . . Repeatedly emphasized during the congressional debates on § 2282 were the heavy pecuniary costs of the unforeseen and debilitating interruptions in the administration of federal law which could be wrought by a single judge's order, and the great burdens entailed in coping with harassing actions brought one after another to challenge the operation of an entire statutory scheme, wherever jurisdiction over government officials could be acquired, until a judge was ultimately found who would grant the desired injunction." *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 154–155. Appellant in this case does not challenge merely a "single, unique exercise" of the Secretary's authority, cf. *Phillips* v. *United States, supra,* at 253. On the contrary, this suit seeks to "paralyze totally the operation of an entire regulatory scheme," indeed, a regulatory scheme designed and administered to promote the security of the Nation.

designate and prescribe for and on behalf of the United States . . . ." [5]

This provision is derived from § 23 of the Act of August 18, 1856, 11 Stat. 52, 60–61, which had, prior to 1926, been re-enacted several times without substantial change. The legislative history of the 1926 Act and its predecessors does not, it is true, affirmatively indicate an intention to authorize area restrictions. However, its language is surely broad enough to authorize area restrictions, and there is no legislative history indicating an intent to exclude such restrictions from the grant of authority; these factors take on added significance when viewed in light of the fact that during the decade preceding the passage of the Act, the Executive had imposed both peacetime and wartime area restrictions. As a result of a famine in Belgium in 1915, the State Department stopped issuing passports for use in that country except to "applicants obliged to go thither by special exigency or authorized by Red Cross or Belgian Relief Commission." III Hackworth, Digest of International Law, p. 526 (1942). Beginning December 9, 1914, and continuing through World War I, passports were validated only for specific purposes and specific countries. No passports were issued for travel in Germany and Austria until July 18, 1922, and none for the Soviet Union until approximately September 1923.

---

[5] The Secretary of State, rather than the President, imposed the restriction on travel to Cuba. However, Congress has provided that "[t]he Secretary of State shall perform such duties as shall from time to time be enjoined on or intrusted to him by the President relative to . . . such . . . matters respecting foreign affairs as the President of the United States shall assign to the department . . . ." R. S. § 202, 5 U. S. C. § 156 (1958 ed.). The President, in turn, has authorized the Secretary in his discretion "to restrict a passport for use only in certain countries [or] to restrict it against use in certain countries . . . ." Exec. Order No. 7856, 3 Fed. Reg. 681, 687, 22 CFR § 51.75.

Hearings before the Senate Committee on Foreign Relations on Department of State Passport Policies, 85th Cong., 1st Sess., pp. 63–64. The use in the 1926 Act of language broad enough to permit executive imposition of area restrictions, after the Executive had several times in the recent past openly asserted the power to impose such restrictions under predecessor statutes containing substantially the same language, supports the conclusion that Congress intended in 1926 to maintain in the Executive the authority to make such restrictions.[6]

This construction of the Act is reinforced by the State Department's continued imposition of area restrictions during both times of war and periods of peace since 1926. For a period of about seven months following the outbreak of war between Italy and Ethiopia in 1935, the Department declined to issue passports for travel in Ethiopia, except to journalists, Red Cross representatives, and others able to show a "compelling exigency" necessitating such travel. In cases where persons did not include Ethiopia in their applications, but were—by reason of the mention in their applications of adjacent countries—suspected of intending to travel therein, their passports were stamped "not valid for use in Ethiopia." III Hackworth, *supra,* pp. 531–532. Following the outbreak of the Spanish Civil War in 1936, passports were stamped "not valid for travel in Spain," with exceptions for newspapermen and persons furnishing medical assistance. *Id.,* at 533–534. A similar restriction was placed on travel to China in August 1937, in view of "the disturbed situation in the Far East." Passports were validated for travel to China only "in exceptional circumstances," and in no case for women or children. *Id.,* at 532–533.

---

[6] *United States* v. *Cerecedo Hermanos y Compania,* 209 U. S. 337; *Service* v. *Dulles,* 354 U. S. 363, 380; *Labor Board* v. *Gullett Gin Co.,* 340 U. S. 361, 366.

On March 31, 1938, the President, purporting to act pursuant to the 1926 Act, specifically authorized the Secretary to impose area restrictions in the issuance of passports, Exec. Order No. 7856, 3 Fed. Reg. 681, 687:

> "The Secretary of State is authorized in his discretion to refuse to issue a passport, to restrict a passport for use only in certain countries, to restrict it against use in certain countries, to withdraw or cancel a passport already issued, and to withdraw a passport for the purpose of restricting its validity or use in certain countries."

This Executive Order is still in force. 22 CFR § 51.75. In September 1939, travel to Europe was prohibited except with a passport specially validated for such travel; passports were so validated only upon a showing of the "imperativeness" of the travel. Departmental Order No. 811, 4 Fed. Reg. 3892.

Area restrictions have also been imposed on numerous occasions since World War II. Travel to Yugoslavia was restricted in the late 1940's as a result of a series of incidents involving American citizens. Dept. State Press Conf., May 9, 1947. Travel to Hungary was restricted between December 1949 and May 1951, and after December 1951.[7] In June 1951, the State Department began to stamp passports "not valid for travel in Czechoslovakia," and declared that all passports outstanding at that time were not valid for such travel. 24 Dept. State Bull. 932. In May 1952, the Department issued a general order that all new passports would be stamped not valid for travel to Albania, Bulgaria, Communist China, Czechoslovakia, Hungary, Poland, Rumania and the Soviet Union. 26 id., at 736. In October 1955, the Secretary announced that passports would no longer require special validation

---

[7] 22 Dept. State Bull. 399; 26 id., at 7.

for travel to Czechoslovakia, Hungary, Poland, Rumania and the Soviet Union, but would be stamped invalid for travel "to the following areas under control of authorities with which the United States does not have diplomatic relations: Albania, Bulgaria, and those portions of China, Korea and Viet-Nam under communist control." 33 id., at 777. In February 1956, the restriction on travel to Hungary was reimposed. 34 id., at 246–248. And in late 1956, passports were for a brief period stamped invalid for travel to or in Egypt, Israel, Jordan and Syria. 35 id., at 756.

Even if there had been no passport legislation enacted since the 1926 Act, the post-1926 history of executive imposition of area restrictions, as well as the pre-1926 history, would be of relevance to our construction of the Act. The interpretation expressly placed on a statute by those charged with its administration must be given weight by courts faced with the task of construing the statute. *Udall* v. *Tallman*, 380 U. S. 1, 16–18; *Norwegian Nitrogen Co.* v. *United States*, 288 U. S. 294, 315. Under some circumstances, Congress' failure to repeal or revise in the face of such administrative interpretation has been held to constitute persuasive evidence that that interpretation is the one intended by Congress.[8] In this case, however, the inference is supported by more than mere congressional inaction. For in 1952 Congress, substantially re-enacting laws which had been passed during the First and Second World Wars,[9] provided that after the issuance of a presidential proclamation of war or national emergency, it would be unlawful to leave or enter the

---

[8] *Norwegian Nitrogen Co.* v. *United States, supra,* at 313; *Costanzo* v. *Tillinghast,* 287 U. S. 341, 345; *United States* v. *Midwest Oil Co.,* 236 U. S. 459, 472–473.

[9] Act of May 22, 1918, 40 Stat. 559; Act of June 21, 1941, 55 Stat. 252.

United States without a valid passport. Section 215 of the Immigration and Nationality Act of 1952, 66 Stat. 190, 8 U. S. C. § 1185 (1958 ed.). The Solicitor General urges that in view of the issuance in 1953 of a presidential proclamation of national emergency which is still outstanding,[10] travel in violation of an area restriction imposed on an otherwise valid passport is unlawful under the 1952 Act. The correctness of this interpretation is a question we do not reach on this appeal, see *infra,* pp. 18–20. But whether or not the new legislation was intended to attach criminal penalties to the violation of area restrictions, it certainly was not meant to cut back upon the power to impose such restrictions. Despite 26 years of executive interpretation of the 1926 Act as authorizing the imposition of area restrictions, Congress in 1952, though it once again enacted legislation relating to passports, left completely untouched the broad rule-making authority granted in the earlier Act. Cf. *Norwegian Nitrogen Co.* v. *United States, supra,* at 313.[11]

This case is therefore not like *Kent* v. *Dulles, supra,* where we were unable to find, with regard to the sort of passport refusal involved there, an administrative practice sufficiently substantial and consistent to warrant the conclusion that Congress had implicitly approved it.

---

[10] Pres. Proc. No. 3004, 67 Stat. c31; cf. Exec. Order No. 11037, 3 CFR 621 (1959–1963 Comp.).

[11] Pres. Proc. No. 3004, 67 Stat. c31, which was issued in 1953 pursuant to § 215, stated that the departure and entry of citizens would be governed by "sections 53.1 to 53.9, inclusive, of title 22 of the Code of Federal Regulations." 22 CFR § 53.8 (1949 ed.) provided:

"Nothing in this part shall be construed to prevent the Secretary of State from exercising the discretion resting in him to refuse to issue a passport, to restrict its use to certain countries, to withdraw or cancel a passport already issued, or to withdraw a passport for the purpose of restricting its validity or use in certain countries."

Appellant reminds us that in summarizing the Secretary's practice in *Kent,* we observed:

> "So far as material here, the cases of refusal of passports generally fell into two categories. First, questions pertinent to the citizenship of the applicant and his allegiance to the United States had to be resolved by the Secretary . . . . Second, was the question whether the applicant was participating in illegal conduct, trying to escape the toils of the law, promoting passport frauds, or otherwise engaging in conduct which would violate the laws of the United States." 357 U. S., at 127.

It must be remembered, in reading this passage, that the issue involved in *Kent* was whether a citizen could be denied a passport because of his political beliefs or associations. In finding that history did not support the position of the Secretary in that case, we summarized that history "so far as material here"—that is, so far as material to passport refusals based on the character of the particular applicant. In this case, however, the Secretary has refused to validate appellant's passport not because of any characteristic peculiar to appellant, but rather because of foreign policy considerations affecting all citizens.

### III.

Having concluded that the Secretary of State's refusal to validate appellant's passport for travel to Cuba is supported by the authority granted by Congress in the Passport Act of 1926, we must next consider whether that refusal abridges any constitutional right of appellant. Although we do not in this case reach the question of whether the 1952 Act should be read to attach criminal penalties to travel to an area for which one's passport is not validated, we must, if we are to approach the constitutional issues presented by this appeal candidly, pro-

14

ceed on the assumption that the Secretary's refusal to validate a passport for a given area acts as a deterrent to travel to that area. In *Kent v. Dulles, supra,* at 125, we held that "[t]he right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment." See also *Aptheker v. Secretary of State, supra,* at 505–506. However, the fact that a liberty cannot be inhibited without due process of law does not mean that it can under no circumstances be inhibited.[12]

The requirements of due process are a function not only of the extent of the governmental restriction imposed,[13] but also of the extent of the necessity for the restriction. Cuba is the only area in the Western Hemisphere controlled by a Communist government. It is, moreover, the judgment of the State Department that a major goal of the Castro regime is to export its Communist revolution to the rest of Latin America.[14] The United States and other members of the Organization of American States have determined that travel between Cuba and the other countries of the Western Hemisphere is an important element in the spreading of subversion, and many have there-

---

[12] *Aptheker v. Secretary of State, supra,* at 505–514; *Shachtman v. Dulles,* 96 U. S. App. D. C. 287, 290 (opinion of the court), 293 (Edgerton, J., concurring), 225 F. 2d 938, 941, 944 (1955); cf. *Bolling v. Sharpe,* 347 U. S. 497, 499–500; Freedom to Travel (Report of Special Committee to Study Passport Procedures, Ass'n of the Bar of the City of New York), pp. 53, 55 (1958); Chafee, Three Human Rights in the Constitution of 1787, p. 192 (1956).

[13] Compare *Kent v. Dulles, supra; Aptheker v. Secretary of State, supra;* Universal Declaration of Human Rights, Art. 13 (quoted, S. Doc. No. 123, 81st Cong., 1st Sess., p. 1157); *Korematsu v. United States,* 323 U. S. 214, 218.

[14] Cuba, Dept. State Pub. No. 7171, pp. 25–36 (1961); see also Ball, U. S. Policy Toward Cuba, Dept. State Pub. No. 7690, p. 3 (1964); 47 Dept. State Bull. 598–600.

fore undertaken measures to discourage such travel.[15]   It also cannot be forgotten that in the early days of the Castro regime, United States citizens were arrested and imprisoned without charges.   We think, particularly in view of the President's statutory obligation to "use such means, not amounting to acts of war, as he may think necessary and proper" to secure the release of an American citizen unjustly deprived of his liberty by a foreign government,[16] that the Secretary has justifiably concluded that travel to Cuba by American citizens might involve the Nation in dangerous international incidents, and that the Constitution does not require him to validate passports for such travel.

The right to travel *within* the United States is of course also constitutionally protected, cf. *Edwards* v. *California*, 314 U. S. 160.   But that freedom does not mean that areas ravaged by flood, fire or pestilence cannot be quarantined when it can be demonstrated that unlimited travel to the area would directly and materially interfere with

---

[15] See Report of the Special Committee to Study Resolutions II.1 and VIII of the Eighth Meeting of Consultation of Ministers of Foreign Affairs, OEA/Ser. G/IV, pp. 14–16 (1963); 48 Dept. State Bull. 517, 719; Resolution I, Final Act, Ninth Meeting of Consultation of Ministers of Foreign Affairs, OEA/Ser. F/II.9 (1964).

[16] R. S. § 2001, 22 U. S. C. § 1732 (1958 ed.), provides :

"Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress."

the safety and welfare of the area or the Nation as a whole. So it is with international travel. That the restriction which is challenged in this case is supported by the weightiest considerations of national security is perhaps best pointed up by recalling that the Cuban missile crisis of October 1962 preceded the filing of appellant's complaint by less than two months.

Appellant also asserts that the Secretary's refusal to validate his passport for travel to Cuba denies him rights guaranteed by the First Amendment. His claim is different from that which was raised in *Kent* v. *Dulles, supra,* and *Aptheker* v. *Secretary of State, supra,* for the refusal to validate appellant's passport does not result from any expression or association on his part; appellant is not being forced to choose between membership in an organization and freedom to travel. Appellant's allegation is, rather, that the "travel ban is a direct interference with the First Amendment rights of citizens to travel abroad so that they might acquaint themselves at first hand with the effects abroad of our Government's policies, foreign and domestic, and with conditions abroad which might affect such policies." We must agree that the Secretary's refusal to validate passports for Cuba renders less than wholly free the flow of information concerning that country. While we further agree that this is a factor to be considered in determining whether appellant has been denied due process of law,[17] we cannot accept the contention of appellant that it is a First Amendment right which is involved. For to the extent that the Secretary's refusal to validate passports for Cuba acts as an inhibition (and it would be unrealistic to assume that it does not), it is an inhibition of action. There are few restrictions

---

[17] Indeed, it was precisely this sort of consideration which led us to hold in *Kent* v. *Dulles, supra,* at 126–127, that the right to travel is protected by the Fifth Amendment. See also *Aptheker* v. *Secretary of State, supra,* at 520 (Douglas, J., concurring).

on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right. The right to speak and publish does not carry with it the unrestrained right to gather information.

Finally, appellant challenges the 1926 Act on the ground that it does not contain sufficiently definite standards for the formulation of travel controls by the Executive. It is important to bear in mind, in appraising this argument, that because of the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature, Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas.

> "Practically every volume of the United States Statutes contains one or more acts or joint resolutions of Congress authorizing action by the President in respect of subjects affecting foreign relations, which either leave the exercise of the power to his unrestricted judgment, or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs." *United States* v. *Curtiss-Wright Corp.,* 299 U. S. 304, 324.

This does not mean that simply because a statute deals with foreign relations, it can grant the Executive totally unrestricted freedom of choice. However, the 1926 Act contains no such grant. We have held, *Kent* v. *Dulles, supra,* and reaffirm today, that the 1926 Act must take its

content from history: it authorizes only those passport refusals and restrictions "which it could fairly be argued were adopted by Congress in light of prior administrative practice." *Kent* v. *Dulles, supra,* at 128. So limited, the Act does not constitute an invalid delegation.

## IV.

Appellant's complaint sought not only an order compelling the Secretary of State to validate his passport for travel to Cuba, but also a declaration that appellant "is entitled under the Constitution and laws of the United States to travel to Cuba," and an order enjoining the Secretary and the Attorney General from interfering with such travel. Read in the context of the arguments appellant makes here, it appears that the intent of the complaint was that these latter prayers should be considered only in the event that the court decided that the Secretary lacks authority to refuse to validate appellant's passport for Cuba. However, the complaint can also be read to incorporate a request that, even if the court should find that the Secretary does have such authority, it go on to decide whether appellant can be criminally prosecuted, under § 215 (b) of the Immigration and Nationality Act of 1952, 66 Stat. 190, 8 U. S. C. § 1185 (b) (1958 ed.), for travel in violation of an area restriction. That section provides:

> "After such proclamation as is provided for in subsection (a) has been made and published and while such proclamation is in force, it shall, except as otherwise provided by the President, and subject to such limitations and exceptions as the President may authorize and prescribe, be unlawful for any citizen of the United States to depart from or enter, or attempt to depart from or enter, the United States unless he bears a valid passport."

A proclamation of the sort referred to was issued in 1953 and remains on the books. Pres. Proc. No. 3004, 67 Stat. c31; cf. Exec. Order No. 11037, 3 CFR 621 (1959–1963 Comp.). We hold that on either interpretation of the complaint, the court below was correct in refusing to reach the issue of criminal liability.

There are circumstances under which courts properly make exceptions to the general rule that equity will not interfere with the criminal processes, by entertaining actions for injunction or declaratory relief in advance of criminal prosecution. See *Evers* v. *Dwyer,* 358 U. S. 202; *Terrace* v. *Thompson,* 263 U. S. 197. However, the Declaratory Judgment Act, 28 U. S. C. § 2201 (1958 ed.), "is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Public Serv. Comm'n* v. *Wycoff Co.,* 344 U. S. 237, 241. The complaint filed in this case does not specify the sort of travel to Cuba appellant has in mind—*e. g.,* whether he plans to proceed to Cuba directly or travel there via one or more other countries. Nor can we tell from the papers filed whether the Government will, in the event appellant journeys to Cuba, charge him under § 215 (b) with leaving the United States on a carrier bound for Cuba with a passport not validated for Cuba; leaving the United States with such a passport with the intent of traveling to Cuba before he returns home; leaving the United States with such a passport on a journey which in fact takes him to Cuba; re-entering the United States with such a passport after having visited Cuba; some other act—or whether it will charge him at all.[18] Whether

---

[18] The Solicitor General does not state with particularity the Government's position as to the reach of § 215 (b) with regard to area restrictions; he simply asserts that § 215 (b) "confirms the authority of the Secretary to impose area restrictions in the issuance of passports and prohibits travel in violation thereof." Brief for Appellees, p. 56; see also *id.,* at 10–11, 60–61.

each or any of these gradations of fact or charge would make a difference as to criminal liability is an issue on which the District Court wisely took no position. Nor do we. For if we are to avoid rendering a series of advisory opinions, adjudication of the reach and constitutionality of § 215 (b) must await a concrete fact situation. Compare *Federation of Labor* v. *McAdory,* 325 U. S. 450.

The District Court therefore correctly dismissed the complaint, and its judgment is

*Affirmed.*

MR. JUSTICE BLACK, dissenting.

Article I of the Constitution provides that *"All* legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." (Emphasis supplied.) I have no doubt that this provision grants Congress ample power to enact legislation regulating the issuance and use of passports for travel abroad, unless the particular legislation is forbidden by some specific constitutional prohibition such as, for example, the First Amendment. See *Aptheker* v. *Secretary of State,* 378 U. S. 500, 517 (concurring opinion); cf. *Kent* v. *Dulles,* 357 U. S. 116. Since Article I, however, vests "All legislative Powers" in the Congress, and no language in the Constitution purports to vest any such power in the President, it necessarily follows, if the Constitution is to control, that the President is completely devoid of power to make laws regulating passports or anything else. And he has no more power to make laws by labeling them regulations than to do so by calling them laws. Like my Brother GOLDBERG, I cannot accept the Government's argument that the President has "inherent" power to make regulations governing the issuance and use of passports. *Post,* pp. 28–30. We emphatically and I think properly rejected a similar argument advanced to support a seizure of the Nation's steel com-

panies by the President. *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U. S. 579. And regulation of passports, just like regulation of steel companies, is a law-making— not an executive, law-enforcing—function.

Nor can I accept the Government's contention that the passport regulations here involved are valid "because the Passport Act of 1926 in unequivocal words delegates to the President and Secretary a general discretionary power over passports . . . ." That Act does provide that "the Secretary of State may grant and issue passports, and cause passports to be granted, issued, and verified in foreign countries . . . under such rules as the President shall designate and prescribe . . . ."[1] Quite obviously, the Government does not exaggerate in saying that this Act "does not provide any specific standards for the Secretary" and "delegates to the President and Secretary a general discretionary power over passports"—a power so broad, in fact, as to be marked by no bounds except an unlimited discretion. It is plain therefore that Congress has not it-self passed a law regulating passports; it has merely referred the matter to the Secretary of State and the President in words that say in effect, "We delegate to you our constitutional power to make such laws regulating passports as you see fit." The Secretary of State has proceeded to exercise the power to make laws regulating the issuance of passports by declaring that he will issue them for Cuba only to "persons whose travel may be regarded as being in the best interests of the United States," as he views those interests. For Congress to attempt to delegate such an undefined law-making power to the Secretary, the President, or both, makes applicable to this 1926 Act what Mr. Justice Cardozo said about the National Industrial Recovery Act:[2] "This is delegation running riot. No such plenitude of power is susceptible of transfer."

---

[1] 44 Stat. 887, 22 U. S. C. § 211a (1958 ed.).

[2] Act of June 16, 1933, 48 Stat. 195.

*A. L. A. Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, 553 (concurring opinion). See also *Panama Ref. Co.* v. *Ryan,* 293 U. S. 388; cf. *Kent* v. *Dulles,* 357 U. S. 116, 129.

Our Constitution has ordained that laws restricting the liberty of our people can be enacted by the Congress and by the Congress only. I do not think our Constitution intended that this vital legislative function could be farmed out in large blocks to any governmental official, whoever he might be, or to any governmental department or bureau, whatever administrative expertise it might be thought to have. The Congress was created on the assumption that enactment of this free country's laws could be safely entrusted to the representatives of the people in Congress, and to no other official or government agency. The people who are called on to obey laws have a constitutional right to have them passed only in this constitutional way. This right becomes all the more essential when as here the person called on to obey may be punishable by five years' imprisonment and a $5,000 fine if he dares to travel without the consent of the Secretary or one of his subordinates." It is irksome enough for one who wishes to travel to be told by the Congress, the constitutional lawmaker with power to legislate in this field, that he cannot go where he wishes. It is bound to be far more irritating—and I do not think the authors of our Constitution, who gave "All" legislative power to Congress, intended—for a citizen of this country to be told that he cannot get a passport because Congress has given an unlimited discretion to an executive official (or viewed practically, to his subordinates) to decide when and where he may go. I repeat my belief that Congress has ample power to regulate foreign travel. And of course, the fact that there may be good and adequate reasons for Congress

---

" 66 Stat. 190, 8 U. S. C. § 1185 (1964 ed.).

to pass such a law is no argument whatever for holding valid a law written not by the Congress but by executive officials. See *Panama Ref. Co.* v. *Ryan, supra,* 293 U. S., at 420. I think the 1926 Act gives the lawmaking power of Congress to the Secretary and the President and that it therefore violates the constitutional command that "All" legislative power be vested in the Congress. I would therefore reverse the judgment.

Mr. Justice Douglas, with whom Mr. Justice Goldberg concurs, dissenting.

Appellant, the holder of a valid United States passport, requested that his passport be validated for travel to Cuba: he wished to make the trip "to satisfy my curiosity about the state of affairs in Cuba and to make me a better informed citizen." The need for validation arose from the Department of State's prior elimination of Cuba from the area for which passports were not required, 22 CFR § 53.3 (b), and from its issuance of a public notice declaring all outstanding passports invalid for travel to Cuba unless specifically endorsed for such travel under the authority of the Secretary of State, 26 Fed. Reg. 492. A companion press release of January 16, 1961, stated that such travel would be permitted by "persons whose travel may be regarded as being in the best interests of the United States, such as newsmen or businessmen with previously established business interests." The Passport Office denied appellant's request for validation. Referring to the press release, the Deputy Director of the Passport Office informed appellant that it was "obvious that your present purpose of visiting Cuba does not meet the standards for validation of your passport."

We held in *Kent* v. *Dulles,* 357 U. S. 116, that the right to travel overseas, as well as at home, was part of the citizen's liberty under the Fifth Amendment. That conclusion was not an esoteric one drawn from the blue. It

24

reflected a judgment as to the peripheral rights of the citizen under the First Amendment. The right to know, to converse with others, to consult with them, to observe social, physical, political and other phenomena abroad as well as at home gives meaning and substance to freedom of expression and freedom of the press. Without those contacts First Amendment rights suffer. That is why in *Kent* v. *Dulles, supra,* we said that freedom of movement has "large social values." *Id.,* at 126.

The ability to understand this pluralistic world, filled with clashing ideologies, is a prerequisite of citizenship if we and the other peoples of the world are to avoid the nuclear holocaust. The late Pope John XXIII in his famous encyclical *Pacem in Terris* stated the idea eloquently:

> "Men are becoming more and more convinced that disputes which arise between States should not be resolved by recourse to arms, but rather by negotiation.
>
> "It is true that on historical grounds this conviction is based chiefly on the terrible destructive force of modern arms; and it is nourished by the horror aroused in the mind by the very thought of the cruel destruction and the immense suffering which the use of those armaments would bring to the human family; and for this reason it is hardly possible to imagine that in the atomic era war could be used as an instrument of justice.
>
> "Nevertheless, unfortunately, the law of fear still reigns among peoples, and it forces them to spend fabulous sums for armaments: not for aggression, they affirm—and there is no reason for not believing them—but to dissuade others from aggression.
>
> "There is reason to hope, however, that by meeting and negotiating, men may come to discover better the bonds that unite them together, deriving from

the human nature which they have in common; and that they may also come to discover that one of the most profound requirements of their common nature is this: that between them and their respective peoples it is not fear which should reign but love, a love which tends to express itself in a collaboration that is loyal, manifold in form and productive of many benefits."

He also said:

"From the fact that human beings are by nature social, there arises the right of assembly and association."

Since we deal with rights peripheral to the enjoyment of First Amendment guarantees, restrictive legislation must be "narrowly drawn" (*Cantwell* v. *Connecticut,* 310 U. S. 296, 307) to meet a precise evil. Only last Term, in *Aptheker* v. *Secretary of State,* 378 U. S. 500, we reaffirmed that when we struck down a provision of the Subversive Activities Control Act of 1950 (64 Stat. 987) because it "too broadly and indiscriminately" restricted the right to travel. *Id.,* at 505. We should do the same here.

I agree that there are areas to which Congress can restrict or ban travel. Pestilences may rage in a region making it necessary to protect not only the traveler but those he might infect on his return. A theatre of war may be too dangerous for travel. Other like situations can be put. But the only so-called danger present here is the Communist regime in Cuba. The world, however, is filled with Communist thought; and Communist regimes are on more than one continent. They are part of the world spectrum; and if we are to know them and understand them, we must mingle with them, as Pope John said. Keeping alive intellectual intercourse between opposing groups has always been important and perhaps was never more important than now.

The First Amendment presupposes a mature people, not afraid of ideas. The First Amendment leaves no room for the official, whether truculent or benign, to say nay or yea because the ideas offend or please him or because he believes some political objective is served by keeping the citizen at home or letting him go. Yet that is just what the Court's decision today allows to happen. We have here no congressional determination that Cuba is an area from which our national security demands that Americans be excluded. Nor do we have a congressional authorization of the Executive to make such a determination according to standards fixed by Congress. Rather we have only the claim that Congress has painted with such a "broad brush" that the State Department can ban travel to Cuba simply because it is pleased to do so. By permitting this, the Court ignores the "familiar and basic principle," *Aptheker* v. *Secretary of State, supra,* at 508, that "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP* v. *Alabama,* 377 U. S. 288, 307.

As I have said, the right to travel is at the periphery of the First Amendment, rather than at its core, largely because travel is, of course, more than speech: it is speech brigaded with conduct. "Conduct remains subject to regulation for the protection of society. . . . [But i]n every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom." *Cantwell* v. *Connecticut, supra,* at 304. Restrictions on the right to travel in times of peace should be so particularized that a First Amendment right is not precluded unless some clear countervailing national interest stands in the way of its assertion.*

---

*Time after time this Court has been alert to protect First Amendment rights which are exercised in a context of overt action which

MR. JUSTICE GOLDBERG, dissenting.

Last year approximately 2,750,000 Americans traveled abroad. More than 1,100,000 passports were issued or renewed, nearly 4,000 of which were obtained by journalists.[1] This phenomenal amount of travel not only demonstrates our curiosity about things foreign, and the increasing importance of, and indeed often necessity for, travel, but it also reflects the long history of freedom of movement which Americans have enjoyed. Since the founding of the Republic our Government has encouraged such travel.[2] For example, in 1820, when John Quincy Adams issued a passport to one Luther Bradish he certified that Bradish was about to visit foreign countries "with the view of gratifying a commendable curiosity."[3] In 1962, however, when appellant requested that his passport be validated so that he might travel to Cuba "to satisfy my curiosity about the state of affairs in Cuba and to make me a better informed citizen," his request was

---

is subject to governmental regulation. "In a series of decisions this Court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." *Shelton* v. *Tucker*, 364 U. S. 479, 488. See, *e. g.*, *Lovell* v. *Griffin*, 303 U. S. 444; *Schneider* v. *State*, 308 U. S. 147; *Cantwell* v. *Connecticut, supra; Martin* v. *Struthers*, 319 U. S. 141; *Saia* v. *New York*, 334 U. S. 558; *Kunz* v. *New York*, 340 U. S. 290; *Schware* v. *Board of Bar Examiners*, 353 U. S. 232, 239; *Louisiana ex rel. Gremillion* v. *NAACP*, 366 U. S. 293; *NAACP* v. *Button*, 371 U. S. 415; *Aptheker* v. *Secretary of State, supra*.

[1] U. S. Dept. of State, Summary of Passport Statistics Jan. 1965.

[2] Very recently the President has requested citizens voluntarily and temporarily to limit their travel abroad because of balance of payments difficulties.

[3] See U. S. Dept. of State, The American Passport 10 (1898).

denied upon the basis of Department of State regulations, issued under the alleged authority of an Executive Order, restricting travel to Cuba.

Appellant attacks the limitation imposed upon the validity of his passport as beyond the inherent power of the Executive, unauthorized by Congress, and beyond the constitutional authority of either the Executive or Congress. I agree with the Court that Congress has the constitutional power to impose area restrictions on travel, consistent with constitutional guarantees, and I reject appellant's arguments to the contrary. With all deference, however, I do not agree with the Court's holding that Congress has exercised this power. Moreover, I do not believe that the Executive has inherent authority to impose area restrictions in time of peace. I would hold, under the principles established by prior decisions of this Court that inasmuch as Congress has not authorized the Secretary to impose area restrictions, appellant was entitled to a passport valid for travel to Cuba.

## I. Inherent Authority of the Executive.

This Court has recognized that the right to travel abroad is "an important aspect of the citizen's 'liberty' " guaranteed by the Due Process Clause of the Fifth Amendment. *Kent* v. *Dulles,* 357 U. S. 116, 127. In *Aptheker* v. *Secretary of State,* 378 U. S. 500, 517, we reaffirmed that "freedom of travel is a constitutional liberty closely related to rights of free speech and association." As nations have become politically and commercially more dependent upon one another and foreign policy decisions have come to have greater impact upon the lives of our citizens, the right to travel has become correspondingly more important. Through travel, by private citizens as well as by journalists and governmental officials, information necessary to the making of informed decisions can be obtained. And, under our constitutional system,

ultimate responsibility for the making of informed decisions rests in the hands of the people. As Professor Chafee has pointed out, "An American who has crossed the ocean is not obliged to form his opinions about our foreign policy merely from what he is told by officials of our government or by a few correspondents of American newspapers. Moreover, his views on domestic questions are enriched by seeing how foreigners are trying to solve similar problems. In many different ways direct contact with other countries contributes to sounder decisions at home." Chafee, Three Human Rights in the Constitution of 1787, 195–196 (1956).

The constitutional basis of the right to travel and its importance to decision-making in our democratic society led this Court in *Kent* v. *Dulles, supra,* to conclude that "[i]f that 'liberty' is to be regulated, it must be pursuant to the law-making functions of the Congress." 357 U. S., at 129. Implicit in this statement, and at the very core of the holding in *Kent* v. *Dulles,* is a rejection of the argument there advanced and also made here by the Government that the Executive possesses an inherent power to prohibit or impede travel by restricting the issuance of passports. The Court in *Kent* expressly recognized that a passport is not only of great value, but also is necessary [4] to leave this country and to travel to most parts of the world. *Kent* v. *Dulles, supra,* at 121. The Court demonstrates in *Kent* v. *Dulles,* and I shall show in detail below, that there is no long-standing and consistent history of the

---

[4] Except for the years 1918 to 1921 and since 1941 American law did not require a passport for travel abroad. Currently, however, § 215 (b) of the Immigration and Nationality Act of 1952, 66 Stat. 190, 8 U. S. C. § 1185 (b) (1958 ed.), makes it unlawful, after the proclamation of a national emergency "to depart from or enter, or attempt to depart from or enter, the United States . . . [without] a valid passport." The Court expresses no views nor do I upon the validity or proper interpretation of this provision, which is currently involved in other litigation not now before us.

exercise of an alleged inherent Executive power to limit travel or restrict the validity of passports. In view of the constitutional basis of the right to travel, the legal and practical necessity for passports, and the absence of a long-standing Executive practice of imposing area restrictions, I would rule here, as this Court did in *Kent* v. *Dulles,* that passport restrictions may be imposed only when Congress makes provision therefor "in explicit terms," *Kent* v. *Dulles, supra,* at 130, consistent with constitutional guarantees. Cf. *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579. I would hold expressly that the Executive has no inherent authority to impose area restrictions in time of peace.

## II. STATUTORY AUTHORITY.

I cannot accept the Court's view that authority to impose area restrictions was granted to the Executive by Congress in the Passport Act of 1926, 44 Stat. 887, 22 U. S. C. § 211a (1958 ed.), which provides, "The Secretary of State may grant and issue passports . . . under such rules as the President shall designate and prescribe for and on behalf of the United States, and no other person shall grant, issue, or verify such passports." I do not believe that the legislative history of this provision, or administrative practice prior to its most recent re-enactment in 1926 will support the Court's interpretation of the statute. Moreover, the nature of the problem presented by area restrictions makes it unlikely that authority to impose such restrictions was granted by Congress in the course of enacting such a broad general statute. In my view, as the history I shall relate establishes, this statute was designed solely to centralize authority to issue passports in the hands of the Secretary of State in order to overcome the abuses and chaos caused by the fact that prior to the passage of the statute numerous unauthorized persons issued passports and travel documents.

## A. *The Legislative History.*

The 1926 provision has its origin in the Act of August 18, 1856, 11 Stat. 52, 60–61.   Prior to 1856 the issuance of passports was not regulated by law.   Governors of States, local mayors, and even notaries public issued documents which served as passports.   This produced confusion abroad.   In 1835 Secretary of State Forsyth wrote:

> "It is within the knowledge of the Department that the diplomatic agents of foreign governments in the United States have declined authenticating acts of governors or other State or local authorities; and foreign officers abroad usually require that passports granted by such authorities shall be authenticated by the ministers or consuls of the United States.   Those functionaries, being thus called upon, find themselves embarrassed between their desire to accommodate their fellow-citizens and their unwillingness to certify what they do not officially know; and the necessity of some uniform practice, which may remove the difficulties on all sides, has been strongly urged upon the Department."   III Moore, International Law Digest 862–863 (1906).

Despite administrative efforts to curb the flow of state and local passports, Secretary of State Marcy wrote in 1854:

> "To preserve proper respect for our passports it will be necessary to guard against frauds as far as possible in procuring them.   I regret to say that local magistrates or persons pretending to have authority to issue passports have imposed upon persons who go abroad with these spurious papers.   Others, again, who know that they are not entitled to passports— not being citizens of the United States—seek to get these fraudulent passports, thinking that they will protect them while abroad."   III Moore, *op. cit. supra,* at 863.

As is noted in an official history of the State Department, "The lack of legal provision on the subject [of passports] led to gross abuses, and 'the impositions practiced upon the illiterate and unwary by the fabrication of worthless passports' [IX Op. Atty. Gen. 350] led finally to the passage of the Act of August 18, 1856." The Department of State of the United States: Its History and Functions 178 (1893). This Act provided that "the Secretary of State shall be authorized to grant and issue passports, and cause passports to be granted, issued, and verified in foreign countries by such diplomatic or consular officers of the United States, and under such rules as the President shall designate and prescribe for and on behalf of the United States, and no other person shall grant, issue, or verify any such passport." 11 Stat. 60. That Act made it a crime for a person to issue a passport who was not authorized to do so. This provision was re-enacted on July 3, 1926, 44 Stat. 887, in substantially identical form.[5] There is no indication in the legislative history either at the time the Act was originally passed in 1856 or when it was re-enacted, that it was meant to serve any purpose other than that of centralizing the authority to issue passports in the hands of the Secretary of State so as to eliminate abuses in their issuance. Thus, in my view, the authority to make rules, granted by the statute to the Executive, extends only to the promulgation of rules designed to carry out this statutory purpose.

---

[5] The following changes have been made in the wording of this provision of the statute between 1856 and the present: When the statute was placed in the Revised Statutes of 1874, the words "shall be authorized to" were replaced by "may." R. S. § 4075. On June 14, 1902, the provision was amended to increase the list of those whom the Secretary could cause to grant, issue and verify passports in foreign countries by adding the words "and by such chief or other executive officer of the insular possessions of the United States." 32 Stat. 386. When the provision was re-enacted in 1926, the list of those whom the Secretary could cause to grant, issue and verify pass-

## B. *The Administrative Practice.*

The administrative practice of the State Department prior to 1926 does not support the Court's view that when Congress re-enacted the 1856 provision in 1926 it intended to grant the Executive authority to impose area restrictions. Prior to the First World War the State Department had never limited the validity of passports for travel to any particular area. In fact, limitations upon travel had been imposed only twice. During the War of 1812 Congress specifically provided by statute that persons could not cross enemy lines without a passport, and in 1861 at the beginning of the Civil War the Secretary of State ruled that passports would not be issued to persons whose loyalty was in doubt. These restrictions were imposed in time of war. The first, restricting the area of travel, evidently was thought to require a specific statutory enactment by Congress, and the second did not limit the area of travel, but, rather, limited the persons to whom passports would be issued.[6] Until 50 years ago peacetime limitations upon the right of a citizen to travel were virtually unknown, see Chafee, *op. cit. supra,* at 193; Jaffe, The Right to Travel: The Passport Problem, 35 Foreign Affairs 17, and it was in this atmosphere that the Act of 1856 was passed and its re-enactment prior to 1926 took place.

The only area restrictions imposed between 1856 and 1926 arose out of the First World War. Although Amer-

ports in foreign countries was modified by substituting for the words "by such diplomatic or consular officers of the United States," the words "by diplomatic representatives of the United States, and by such consul generals, consuls, or vice consuls when in charge, as the Secretary of State may designate," and the words "such passports" were substituted for the words "any such passport." 44 Stat. 887.

[6] See *Kent* v. *Dulles, supra,* at 128, where the Court implies that regulation of travel based upon disloyalty to the country during wartime presents quite a different question from such regulation in time of peace.

icans were not required by law to carry passports in 1915, certain foreign countries insisted that Americans have them. American Consulates and Embassies abroad were therefore authorized to issue *emergency* passports after the outbreak of the war, and in 1915 the Secretary of State telegraphed American Ambassadors and Ministers in France, Germany, Great Britain, Italy, the Netherlands, and Denmark: "Do not issue emergency passports for use in Belgium [then occupied by German armed forces] unless applicants obliged to go thither by special exigency or authorized by Red Cross or Belgian Relief Commission." See III Hackworth, Digest of International Law 525–526 (1942). After the United States entered World War I travel to areas of belligerency and to enemy countries was restricted. Passports were marked not valid for travel to these areas, and Congress provided by statute that passports were necessary in order to leave or enter the United States. The congressional Act requiring passports for travel expired in 1921, and soon after the official end of the war passports were marked valid for travel to all countries. See III Hackworth, *supra,* at 527; Hearings before the Senate Committee on Foreign Relations on Department of State Passport Policies, 85th Cong., 1st Sess., 64 (hereafter Senate Hearings). Thus in 1926 freedom of travel was as complete as prior to World War I. In this atmosphere Congress re-enacted, in virtually identical terms, the 1856 statute, the sole purpose of which, as I have already noted, was to centralize passport issuance. Congress in doing so did not indicate the slightest intent or desire to enlarge the authority of the Executive to regulate the issuance of passports. Surely travel restrictions imposed while the United States was at war and a single telegram instructing ministers to deny emergency passports for a brief time in 1915 for travel to a theatre of war, do not show that Congress, by re-enacting the 1856 Act in 1926, intended to authorize the Execu-

tive to impose area restrictions upon travel in peacetime whenever the Executive believed such restrictions might advance American foreign policy. The long tradition of freedom of movement, the fact that no passport area restrictions existed prior to World War I, the complete absence of any indication in the legislative history that Congress intended to delegate such sweeping authority to the Executive all point in precisely the opposite direction.[7]

In *Kent* v. *Dulles, supra,* the Court held that the 1926 Act did not authorize the Secretary of State to withhold passports from persons because of their political beliefs or associations. Although it was argued that prior to

[7] The Court also argues that State Department imposition of area restrictions after 1926 shows that the Act granted power to impose such restrictions, for a consistent administrative interpretation must be given weight by the courts. *Ante,* at 11. See *Norwegian Nitrogen Co.* v. *United States,* 288 U. S. 294. With all deference, I do not find a consistent administrative interpretation of the 1926 Act. While area restrictions have been imposed by the Executive from time to time since 1926, see Senate Hearings 64–65, the Executive has also indicated doubts as to its authority to restrict passports. In 1958 the President formally asked Congress for "clear statutory authority to prevent Americans from using passports for travel to areas where there is no means of protecting them, or where their presence would conflict with our foreign policy objectives." H. R. Doc. No. 417, 85th Cong., 2d Sess. In 1957 the Report of the Commission on Government Security expressly recommended that it be made unlawful "for any citizen of the United States to travel to any country in which his passport is declared to be invalid." S. Doc. No. 64, 85th Cong., 1st Sess., 475. Moreover, when the Department of State announced limitations on the use of passports for travel to Red China, the accompanying press release stated that the restrictions did not forbid American travel to the areas restricted. See Senate Hearings 40; Report of the Association of the Bar of the City of New York, Freedom to Travel 70 (1958). In any event I believe that the evidence set out above that Congress did not mean the 1926 Act to authorize the imposition of area restrictions is sufficiently strong so that it is not overcome by the fact that after 1926 the Department on occasion asserted that it had an inherent power to impose such restrictions.

36

1926 the Secretary had withheld passports from Communists and other suspected subversives and that such an administrative practice had been adopted by Congress, the Court found that the evidence of such a practice was insufficient to warrant the conclusion that it had congressional authorization.

Yet in *Kent* v. *Dulles* the Government pointed to scattered Executive interpretations showing that upon occasion the State Department believed that it had the authority in peacetime to withhold passports from persons deemed by the Department to hold subversive beliefs. In 1901 Attorney General Knox advised the Secretary of State that a passport might be withheld from "an avowed anarchist." 23 Op. Atty. Gen. 509, 511. Orders promulgated by the Passport Office periodically have required denial of passports to "revolutionary radicals." See Passport Office Instructions of May 4, 1921. A State Department memorandum of May 29, 1956, in summarizing the Department's passport policy, states that after the Russian Revolution "passports were refused to American Communists who desired to go abroad for indoctrination, instruction, etc. This policy was continued until 1931 . . . ." [8]

These isolated instances of the assumption of authority to refuse passports to persons thought subversive were held insufficient to show that Congress in 1926 intended to grant the Secretary of State discretionary authority to deny passports to persons because of their political beliefs, *Kent* v. *Dulles, supra,* at 128. This case presents an even more attenuated showing of administrative practice, for there is revealed only one isolated instance of a peacetime area restriction and this closely connected with World War I. Clearly this single instance is insufficient to show

---

[8] See the *Report of the Commission on Government Security* 470, 471 (1957).

that Congress intended to authorize the Secretary to impose peacetime area restrictions.

Moreover, just as the more numerous instances of restriction on travel because of political beliefs and associations in wartime were insufficient to show that Congress intended to grant the Secretary authority to curtail such travel in time of peace, see *Kent* v. *Dulles, supra,* at 128, so here the fact that area restrictions were imposed during World War I does not show that Congress intended to grant the Secretary authority to impose such restrictions in time of peace. In time of war and in the exercise of the war power, restrictions may be imposed that are neither permissible nor tolerable in time of peace. See *Kent* v. *Dulles, supra,* at 128; cf. *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579. But see *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144. Thus even if the State Department's wartime practice should lead to the conclusion that area restrictions in time of war were sanctioned, it surely does not show that Congress wished to authorize similar curtailment of the right to travel in time of peace.[9]

While the Court intimates that *Kent* v. *Dulles* is distinguishable from the present case because in *Kent* v. *Dulles* passports were denied on the basis of the applicants' political beliefs, *ante,* at 13, I find little in the logic of that opinion to support such a distinction. The Court in *Kent* v. *Dulles* based its conclusions that the Executive does not have an inherent power to impose peacetime passport restrictions and that Congress did not delegate such authority to the Executive on the history of

---

[9] Although the United States has severed its diplomatic ties with the Castro government, and, as the Court correctly points out, *ante,* at 14–15, justifiably regards the Castro regime as hostile to this country, the United States is not in a state of war with Cuba. See *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398, 410.

passport restrictions and the constitutional basis of the right to travel. While the Court there mentions that it is dealing "with beliefs, with associations, with ideological matters," 357 U. S., at 130, a reading of the opinion clearly reveals that its holding does not turn upon such factors. Moreover, the importance of travel to the gathering of information, an activity closely connected with the First Amendment and a right asserted here, seems to be a major reason for the Court's holding in *Aptheker* and *Kent* that the right to travel is afforded constitutional protection. *Kent* v. *Dulles* thus seems not only relevant, but controlling, in the case presented here.

### C. *The Statute's Inapplicability to the Problem of Area Restrictions.*

The Court's interpretation of the 1926 Passport Act not only overlooks the legislative history of the Act and departs from the letter and spirit of this Court's decisions in *Kent* v. *Dulles, supra,* and *Aptheker* v. *Secretary of State, supra,* but it also implies that Congress resolved, through a sweeping grant of authority, the many substantial problems involved in curtailing a citizen's right to travel because of considerations of national policy. People travel abroad for numerous reasons of varying importance. Some travel for pleasure, others for business, still others for education. Foreign correspondents and lecturers must equip themselves with firsthand information. Scientists and scholars gain considerably from interchanges with colleagues in other nations. See Chafee, *op. cit. supra,* at 195.

Just as there are different reasons for people wanting to travel, so there are different reasons advanced by the Government for its need to impose area restrictions. These reasons vary. The Government says restrictions are imposed sometimes because of political differences with countries, sometimes because of unsettled conditions, and sometimes, as in this case, as part of a program, under-

taken together with other nations, to isolate a hostile foreign country such as Cuba because of its attempts to promote the subversion of democratic nations. See Senate Hearings 63–69. The Department of State also has imposed different types of travel restrictions in different circumstances. All newsmen, for example, were prohibited from traveling to China, see Senate Hearings 67, but they have been allowed to visit Cuba. See Public Notice 179 (Jan. 16, 1961), 26 Fed. Reg. 492; Press Release No. 24, issued by the Secretary of State, Jan. 16, 1961. In view of the different types of need for travel restrictions, the various reasons for traveling abroad, the importance and constitutional underpinnings of the right to travel and the right of a citizen and a free press to gather information about foreign countries, it cannot be presumed that Congress, without focusing upon the complex problems involved, resolved them by adopting a broad and sweeping statute which, in the Court's view, confers unlimited discretion upon the Executive, and which makes no distinctions reconciling the rights of the citizen to travel with the Government's legitimate needs. I do not know how Congress would deal with this complex area were it to focus on the problems involved, or whether, for example, in light of our commitment to freedom of the press, Congress would consent under any circumstances to prohibiting newsmen from traveling to foreign countries. But, faced with a complete absence of legislative consideration of these complex issues, I would not presume that Congress, in 1926, issued a blanket authorization to the Executive to impose area restrictions and define their scope and duration, for the nature of the problem seems plainly to call for a more discriminately fashioned statute.

### III. CONCLUSION.

In my view it is clear that Congress did not mean the 1926 Act to authorize the Executive to impose area re-

strictions in time of peace, and, with all deference, I disagree with the Court's holding that it did. I agree with the Court that Congress may authorize the imposition of travel restrictions consistent with constitutional guarantees, but I find it plain and evident that Congress has never considered and resolved the problem. After consideration Congress might determine that broad general authority should be delegated to the Secretary of State, or it might frame a narrower statute. I believe that here, as in other areas, appropriate delegation is constitutionally permissible where some standard for the application of delegated power is provided. See, *e. g., Lichter* v. *United States,* 334 U. S. 742, 785. However, in light of my conclusion that the 1926 Act did not deal with area restrictions I do not find it necessary to consider the question of whether the language of the 1926 Act might constitute an unconstitutionally broad delegation of power.

In view of the different types of need for area restrictions asserted by the Government, the various reasons for travel abroad, the importance and constitutional underpinnings of the right of citizens and a free press to gather information about foreign countries—considerations which Congress did not focus upon—I would not infer, as the Court does, that Congress resolved the complex problem of area restrictions, which necessarily involves reconciling the rights of the citizen to travel with the Government's legitimate needs, by the re-enactment of a statute that history shows was designed to centralize authority to issue passports in the Secretary of State so as to prevent abuses arising from their issuance by unauthorized persons. Since I conclude that the Executive does not possess inherent power to impose area restrictions in peacetime, and that Congress has not considered the issue and granted such authority to the Executive, I would reverse the judgment of the District Court.