724 F.2d 753
 20 ERC 1718, 1985 A.M.C. 1811, 14
Envtl. L. Rep. 20,317
 John R. BALELO, Andrew Castagnola, Leo Correia, Manuel S.
Jorge, Bryan R. Madruga, Harold Medina, John A. Silva, Ralph
F. Silva, Jr., George Sousa, Manuel S. Vargas, Jr., John B.
Zolezzi, Jr., Plaintiffs-Appellees,
v.
Malcolm BALDRIGE, Secretary of Commerce of the United
States, Richard A. Frank, Administrator, National Oceanic
and Atmospheric Administration and Terry Leitzell, Assistant
Administrator for Fisheries, National Marine Fisheries
Service, Defendants-Appellants,
Environmental Defense Fund, Inc., et al.,
Intervenors-Defendants-Appellants.*]
UNITED STATES of America, Plaintiff,
v.
$50,178.80, THE MONETARY VALUE OF 57 TONS OF TUNA, Defendant,
Gladiator Fishing, Inc., Claimant.**
 Nos. 81-5806, 81-5807 and 82-5433.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted En Banc
Sept. 15, 1983.
Decided Jan. 24, 1984.
 
 Raymond F. Zvetina, Haskins, Nugent, Newham, Kane & Zvetina, San Diego, Cal., Shirli Fabbri Weiss, Gray, Cary, Ames & Frye, La Jolla, Cal., for plaintiffs-appellees in Nos. 81-5806 and 81-5807; Peter Osinoff, Los Angeles, Cal., for plaintiffs-appellees.
 Wayne S. Braveman, Tuttle & Taylor, Inc., Los Angeles, Cal., Donald A. Carr, Dept. of Justice, Washington, D.C., for defendants-appellants in Nos. 81-5806 and 81-5807; William N. Kammer, Gray, Cary, Ames, & Frye, San Diego, Cal., for defendants-appellants in No. 82-5433.
 Appeals from the United States District Courts for the Southern and Central Districts of California.
 Before BROWNING, SNEED, KENNEDY, ANDERSON, TANG, SCHROEDER, PREGERSON, ALARCON, FERGUSON, NELSON and CANBY, Circuit Judges.
 ALARCON, Circuit Judge:
 
 
 1
 In Balelo v. Klutznick, 519 F.Supp. 573 (S.D.Cal.1981), plaintiffs-appellees, who are captains of tuna purse seiners (hereinafter the Captains), instituted this action against defendants-appellants (hereinafter the Secretary) seeking declaratory and injunctive relief.[1] The district court granted a declaratory judgment invalidating subsection (f) of regulation 50 C.F.R. Sec. 216.24 (1981) promulgated by the Secretary of Commerce[2] pursuant to the Marine Mammal Protection Act (hereinafter MMPA), 16 U.S.C. Sec. 1371.
 
 
 2
 Under the regulation, the Captains are permitted to take porpoise during commercial fishing operations only if they comply with certain conditions.[3] They must allow government observers to board and accompany the vessel on regular fishing trips "for the purpose of research or observing operations." 50 C.F.R. 216.24(f). The regulation further authorizes the collection of data which may be used in MMPA enforcement proceedings. Id. The district court ruled that the regulation was unconstitutional only insofar as it permitted the use of observer collected data in MMPA enforcement proceedings.
 
 
 3
 In United States v. $50,178.80, the Monetary Value of 57 Tons of Tuna and Gladiator Fishing, Inc., Cv. No. 79-4466-LEW (MX) (C.D.Cal. April 21, 1982), a civil forfeiture proceeding, the district court denied a motion to suppress evidence of observer collected data.
 
 
 4
 We have taken these matters en banc to consider whether the regulation is valid under the MMPA, and if so, whether it violates the fourth amendment. For the reasons set forth below, we have concluded that: (1) the regulation was authorized under the broad rule-making power delegated by Congress to the Secretary; (2) the regulation is consistent with the policies and objectives of the MMPA; and (3) the regulation falls within the pervasively regulated industry exception to the warrant requirement of the fourth amendment.
 
 FACTUAL AND STATUTORY BACKGROUND
 
 5
 The Captains utilize a method of fishing for yellow-fin tuna which results in the incidental taking[4] of certain species of porpoise. Porpoise tend to swim in association with yellow-fin tuna in the eastern tropical Pacific. The porpoise is larger and more active on the ocean's surface. Thus, the Captains can locate yellow-fin tuna by spotting porpoise. Purse seine nets are then set around schools of porpoises. The tuna swimming beneath them are encircled when the net is closed or "pursed" around them. During this operation, significant numbers of porpoise are injured or drowned. Their carcasses are discarded into the sea. In the two years preceding the enactment of the MMPA in 1972, the incidental taking resulted in more than 600,000 porpoise mortalities. Committee for Humane Legislation Inc. v. Richardson, 414 F.Supp. 297, 300 (D.D.C.), aff'd, 540 F.2d 1141 (D.C.Cir.1976).
 
 
 6
 Congress' overriding purpose in enacting the MMPA was the protection of marine mammals. Congress declared the immediate goal of the MMPA to be "that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. Sec. 1371(a)(2) (1976-1982). To accomplish this goal, Congress imposed a moratorium on the taking and importing of marine mammals. 16 U.S.C. Sec. 1371(a) (1976-1982). A two-year exemption from the moratorium for the taking of marine mammals incidental to commercial fishing operations was allowed. 16 U.S.C. Sec. 1371(a)(2) (1976), amended by 16 U.S.C. Sec. 1371(a)(2) (1982). The legislative history indicates that the exemption was provided "for the refinement of these fishing gear modifications" which industry representatives proffered as a solution to the porpoise mortality problem. Committee for Humane Legislation, 414 F.Supp. at 301.[5] In addition, the Act directed the "immediate" undertaking of a research and development program to devise improved fishing methods and gear so as to reduce the incidental taking of marine mammals in connection with commercial fishing. 16 U.S.C. Sec. 1381(a) (1976).
 
 
 7
 Although the commercial fishing industry was exempted for two years from the moratorium, the incidental taking of mammals during this time was conditioned on industry compliance with section 1381.[6] See, e.g., 16 U.S.C. Sec. 1371(a)(2) (1976), amended by 16 U.S.C. Sec. 1371(a)(2) (1982). Subsection (d) of section 1381 requires the industry to allow agents of the Secretary "to board and to accompany any commercial fishing vessel ... on a regular fishing trip for the purpose of conducting research or observing operations in regard to the development of improved fishing methods and gear as authorized by this section." 16 U.S.C. Sec. 1381(d) (1976-1982). Since expiration of this two-year exemption in 1974, the taking of marine mammals incidental to commercial fishing must be pursuant to a permit issued by the Secretary, 16 U.S.C. Sec. 1371(a)(2), "subject to regulations prescribed by the Secretary in accordance with section 1373." 16 U.S.C. Sec. 1371(a)(2) (1976-1982).
 
 
 8
 Section 1373 requires the Secretary to consider, in promulgating the regulations, the "existing and future levels of marine mammal species and population stocks," 16 U.S.C. Sec. 1373(b)(1) (1976-1982), and the "marine ecosystem and related environmental considerations," 16 U.S.C. Sec. 1373(b)(3) (1976-1982). The regulations may also restrict the taking of porpoise by species, number, age, sex, or other factors. 16 U.S.C. Sec. 1373(c) (1976-1982). In addition to the rule-making authority conferred upon the Secretary, 16 U.S.C. Sec. 1373, the MMPA provides for the imposition of civil and criminal penalties for violations of the provisions of the Act or the regulations or permits issued thereunder. 16 U.S.C. Sec. 1375(a) (1982).
 
 
 9
 In 1974, the Secretary promulgated a regulation, 50 C.F.R. Sec. 216.24(f) (1974), in language virtually identical to that set forth in section 1381,[7] the statutory observer program, that required the placement of observers on vessels.
 
 
 10
 Pursuant to the powers granted under the MMPA, the Secretary promulgated the regulation at issue here. The challenged regulation, effective January 1, 1981, requires as a condition of engaging in fishing operations that vessel owners:
 
 
 11
 (1) ... [S]hall, upon the proper notification by the [NMFS], allow an observer duly authorized by the secretary to accompany the vessel on any or all regular fishing trips for the purpose of conducting research and observing operations, including collecting information which may be used in civil or criminal penalty proceedings, forfeiture actions, or permit or certificate sanctions.
 
 
 12
 * * *
 
 
 13
 * * *
 
 
 14
 (4) The Secretary shall provide for the payment of all reasonable costs directly related to the quartering and maintaining of such observers on board such vessels. A vessel certificate holder who has been notified that the vessel is required to carry an observer, via certified letter from the National Marine Fisheries Service, shall notify the office from which the letter was received at least five days in advance of the fishing voyage to facilitate observer placement. A vessel certificate holder who has failed to comply with the provisions of this section may not engage in fishing operations for which a general permit is required.
 
 
 15
 50 C.F.R. Sec. 216.24(f) (1981) (emphasis added).[8]
 
 
 16
 The Captains appear to have no objection to the observers' scientific role on board ship. Their objection is directed solely at those provisions of the 1981 regulation which authorize the use of observer collected data in enforcement proceedings. In the Captain's opening brief we are told that: "The District Court's injunction properly stripped the observer program of its unauthorized and impermissible search function and restored it to its pristine role of pure scientific fact-gathering." Appellees' opening brief at 9 (emphasis added).
 
 IMPLIED CONGRESSIONAL AUTHORIZATION
 
 17
 The first issue we must address is whether the 1981 regulation is authorized by the rule-making power delegated by Congress to the Secretary. See FCC v. Schreiber, 381 U.S. 279, 290, 291, 85 S.Ct. 1459, 1467, 1468, 14 L.Ed.2d 383 (1965) (Court first addressed whether regulation promulgated by agency was authorized by statute); Haig v. Agee, 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (same).
 
 
 18
 The Captains argue that the regulation prescribing the observer program is invalid because it was not expressly authorized by Congress. The Captains contend that the observer program is a constitutionally questionable method of enforcing regulatory schemes and that under Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) authorization for such a rule cannot be found absent an explicit congressional grant. Greene does not stand for the proposition that Congress must expressly authorize any action which might be challenged on constitutional grounds. Rather, the case indicates that Congress will not be presumed to have authorized agency methods which depart radically from accepted norms. In the matter before us, we are being asked to decide whether a particular warrantless search is authorized by Congress and whether that search violates the fourth amendment. Merely because some warrantless searches may violate the fourth amendment, it does not follow that no warrantless search may be undertaken pursuant to federal law absent express congressional authorization. Unlike the types of procedures at issue in Greene, certain types of warrantless searches have traditionally been recognized as constitutionally valid. See Henderson v. United States, 390 F.2d 805 (9th Cir.1967) (border searches); United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (search incident to arrest); South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (inventory searches); Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (exigent circumstances); Donovan v. Dewey, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (regulated industry searches). Nothing in Greene prohibits us from determining whether Congress implicitly authorized the observer program. In our discussions below, we reject the contentions that the observer program substantially departs from accepted methods of enforcing regulatory schemes, and the Greene case is therefore inapplicable.
 
 
 19
 To determine whether the regulation was authorized by Congress, we must analyze the language of the statute. Haig v. Agee, 453 U.S. 280, 289-90, 101 S.Ct. 2766, 2773, 69 L.Ed.2d 640 (1981). Section 1371 of the MMPA provides in pertinent part:
 
 
 20
 There shall be a moratorium on the taking and importation of marine mammals.... Marine mammals may be taken incidentally in the course of commercial fishing operations and permits may be issued therefor under section 1374 ... subject to regulations prescribed by the Secretary in accordance with section 1373.... The Secretary ... is authorized and directed ... to determine when, to what extent, if at all, and by what means, it is compatible with this chapter to waive the requirements of this section so as to allow taking, or importing of any marine mammal, ... and to adopt suitable regulations, issue permits, and make determinations ... permitting and governing such taking and importing....
 
 
 21
 16 U.S.C. Sec. 1371 (1976-1982) (emphasis added).
 
 
 22
 Section 1373 provides that the Secretary "shall prescribe such regulations with respect to the taking ... as he deems necessary and appropriate to insure that such taking will not be to the disadvantage of those species ... and will be consistent with the purposes and policies set forth in section 1361." 16 U.S.C. Sec. 1373(a) (1976-1982) (emphasis added). The Secretary is required to report to Congress every twelve months on the status of the species and "to describe those actions taken and those measures believed necessary, including where appropriate, the issuance of permits ... to assure the well being of such marine mammals." 16 U.S.C. Sec. 1373(f).
 
 
 23
 Section 1374 provides that the Secretary may issue permits and that he "shall prescribe such procedures as are necessary to carry out this section." 16 U.S.C. Sec. 1374(d)(1) (emphasis added). In addition, the applicant for any permit "must demonstrate to the Secretary that the taking ... under such permit will be consistent with the purposes of this Chapter ... and the applicable regulations established under section [1373]." Id. at Sec. 1374 (emphasis added). The Secretary may issue general permits for the "taking of marine mammals" together with regulations to cover the use of such permits which are "[c]onsistent with the regulations prescribed pursuant to section 1373 ... and the requirements of section 1371." 16 U.S.C. Sec. 1374(h).
 
 
 24
 It is quite true that the MMPA does not expressly confer upon the Secretary a power to impose, as a condition of obtaining a permit, the stationing of an observer on a vessel. In our view, however, that power is implicit in the broad rule-making authority expressly delegated to the Secretary. See Haig v. Agee, 453 U.S. at 291, 101 S.Ct. at 2773-2774 (Secretary of State's power to revoke passports is implicit in broad rule-making authority conferred upon the Secretary by the Passport Act).
 
 
 25
 The Supreme Court has admonished that even though a statute does not explicitly delegate a specific action, "particularly in light of the 'broad rule-making authority granted' ... a consistent administrative construction of that statute must be followed by the courts " 'unless there are compelling indications that it is wrong" ' ...." Haig v. Agee, 453 U.S. at 291, 101 S.Ct. at 2774. (citations omitted.) Accordingly, the specific content of the regulation need not be expressly authorized. The regulation is proper so long as it conforms to the fundamental objective of the Act, rationally complements its remedial scheme, Whirlpool Corp. v. Marshall, 445 U.S. 1, 11, 12, 100 S.Ct. 883, 890, 891, 63 L.Ed.2d 154 (1980), and "the policy [thereby] announced ... is 'sufficiently substantial and consistent' to compel the conclusion that Congress approved it." Haig, 453 U.S. at 307, 101 S.Ct. at 2782 (quoting Zemel v. Rusk, 381 U.S. 1, 12, 85 S.Ct. 1271, 1279, 14 L.Ed.2d 179 (1965)). Accord Mourning v. Family Publications Service, Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 1660-61, 36 L.Ed.2d 318 (1973); United States v. Southwestern Cable Co., 392 U.S. 157, 177, 88 S.Ct. 1994, 2005, 20 L.Ed.2d 1001 (1968) ("We may not in the absence of compelling evidence that such was not Congress' intention ... prohibit administrative action imperative for achievement of an agency's ultimate purposes."). (citation omitted); American Trucking Ass'n v. United States, 344 U.S. 298, 310, 73 S.Ct. 307, 314-15, 97 L.Ed. 337 (1953) (Congress creates regulatory agencies so that they will bring to their work the expert's familiarity with industry conditions that delegating legislatures cannot be expected to possess).
 
 
 26
 In Mourning, the Supreme Court upheld the power of the Federal Reserve Board to promulgate regulation "Z" pursuant to the Board's broad rule-making authority under the Truth and Lending Act. 15 U.S.C. Sec. 1604. The Court emphasized that:
 
 
 27
 Where the empowering provision of a statute states simply that the agency may "make ... such rules and regulations as may be necessary to carry out the provisions of this Act," ... a regulation promulgated thereunder will be sustained so long as it is "reasonably related to the purposes of the enabling legislation."
 
 
 28
 411 U.S. at 369, 93 S.Ct. at 1660-1661. (citations omitted).
 
 
 29
 It appears to us that the regulation at issue here is consistent with the objective and directives of the MMPA. Requiring the Captains to consent to the placement of observers on their vessels as a condition of obtaining a fishing permit is reasonably related to the purposes of the enabling legislation. The paramount purpose of the Act is "the protection and conservation of marine mammals." 16 U.S.C. Sec. 1371.[9] As the D.C. Circuit has observed, the MMPA is to be administered "for the benefit of protected species, rather than for the benefit of commercial exploitation." Committee for Humane Legislation, 540 F.2d at 1148.
 
 
 30
 Effective implementation of the MMPA would be impossible without the use of observers for enforcement purposes. Under the MMPA, any incidental taking of marine mammals must be pursuant to a permit issued by the Secretary. 16 U.S.C. Sec. 1371. The permits must specify such factors as the number, kind, age, sex, and location of the mammals to be taken. 16 U.S.C. Sec. 1374(b). Such limitations are necessary to assure that the MMPA's goal of reducing marine mammal mortality to the minimum practical is met.
 
 
 31
 The affidavit offered by the government on its motion for summary judgment discloses that the use of on-board observers is the only practicable method of enforcing the limitations in MMPA permits. The tuna vessels subject to the Secretary's regulation operate over thousands of square miles of open ocean for months at a time. No independent surveillance program could hope to be able to verify whether or not a particular vessel complied with its trip quota. Even if such a technically feasible surveillance program were available, its costs would be prohibitive. The observer program is thus "necessary and appropriate to insure that such taking will not be to the disadvantage of those species ... and will be consistent with the purposes and policies set forth in the [MMPA]." 16 U.S.C. Sec. 1373(a). Because the observer program is necessary for the enforcement of the MMPA, it is within the authority granted to the Secretary by Congress. See Southwestern Cable, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (authority normally presumed for regulations necessary to enforce its statutory mandate); cf. Mourning, 411 U.S. at 371-72, 93 S.Ct. at 1662 ("That some other remedial provision might be preferable is irrelevant. We have consistently held that where reasonable minds may differ as to which of several remedial measures should be chosen, courts should defer to the informed experience and judgment of the agency to whom Congress delegated appropriate authority."). In addition, the Secretary could not fulfill his duty under the MMPA to make annual reports to Congress if the observer program were discontinued. See 16 U.S.C. Sec. 1373(f); cf. FCC v. Schreiber, 381 U.S. at 294, 85 S.Ct. at 1469-1470 (rule promulgated by FCC necessary to execute its duty to make annual reports to Congress).
 
 
 32
 In upholding the regulation, we are impressed by the fact that Congress, through oversight hearings, was made aware of the continued existence of the observer program. Congress was informed through hearings conducted from 1976 to 1981 that information gathered by observers might be used in penalty proceedings.[10] In 1981, Congress amended the MMPA and did not disturb the Secretary's broad-rule making authority in spite of this regulation.[11] See Haig v. Agee, 453 U.S. at 301 & n. 50, 101 S.Ct. at 2779 & n. 50 (quoting Zemel v. Rusk, 381 U.S. at 21, 85 S.Ct. at 1283 (fact that Congress left rule-making authority untouched while amending Act gives rise to presumption that Congress has adopted the construction)). Thus, as in Haig v. Agee, "the inference of congressional approval 'is supported by more than mere congressional inaction.' " 453 U.S. at 301, 101 S.Ct. at 2779. (quoting Zemel v. Rusk, 381 U.S. 1, 11-12, 85 S.Ct. 1271, 1283, 14 L.Ed.2d 179 (1965)); cf. Fredericks v. Kreps, 578 F.2d 555, 563 (5th Cir.1978) (en banc) (congressional oversight committee's awareness of regulations before they were put into effect reinforces determination that regulation is consistent with Congress' intent). See also Andrus v. Allard, 444 U.S. 51, 57, 100 S.Ct. 318, 322, 62 L.Ed.2d 210 (1979) (Court upheld regulation noting that Congress twice reviewed and amended the Act without rejecting the Department's view that it was authorized under the Eagle Protection Act, 16 U.S.C. Sec. 688, to bar sale of preexisting artifacts); NLRB v. Bell Aerospace Co., 416 U.S. 267, 274-75, 94 S.Ct. 1757, 1761-62, 40 L.Ed.2d 134 (1974) (great weight may be accorded a long standing interpretation of a statute by an agency charged with its administration especially where Congress has reenacted the statute without pertinent change; failure to repeal or revise the agency's interpretation is persuasive evidence that Congress intended the interpretation).
 
 
 33
 The Captains advance two arguments against this construction. The first is that since Congress explicitly authorized funds for an observer program for only two years, 16 U.S.C. Sec. 1381, the Secretary's regulation adopting an observer program beyond this two-year period exceeds statutory authority. As noted earlier, the legislative history suggests, and the statute itself reflects, that this program was adopted to enable the Secretary to observe the industry's utilization of advanced gear which purportedly would protect marine mammals.[12] Moreover, the program was a condition to the industry's incidental taking of porpoise during the exemption from the moratorium. 16 U.S.C. Sec. 1371(a)(2) (1976), amended by 16 U.S.C. Sec. 1371 (1982). Thereafter, the Secretary was authorized to waive the moratorium pursuant to regulations he deemed necessary and appropriate. Id.; 16 U.S.C. Sec. 1373. Certainly, if Congress deemed the observer program a necessary condition to allowing the industry an exemption from the moratorium to ensure the protection of marine mammals, it is not unreasonable for the Secretary, in waiving the moratorium, to so condition the issuance of a permit for commercial fishing. The fact that funding for the statutory program was authorized by Congress only during the industry's two-year exemption does not indicate to us that Congress intended to ban the use of observer programs.
 
 
 34
 Further, the expiration of the statutory observer program and the termination of the industry's exemption from the moratorium on takings imposed by the MMPA coincided with the commencement of the rule-making authority delegated to the Secretary. 16 U.S.C. Sec. 1371(a)(2) (1976), amended by 16 U.S.C. Sec. 1371(a)(2) (1982). This suggests that Congress meant what the MMPA clearly states: The Secretary would have the broad authority to "determine when, to what extent, if at all, and by what means, it is compatable with ... [the MMPA] to allow taking ... of any marine mammal, ... and to adopt suitable regulations, issue permits, and make determinations ... permitting and governing such taking." 16 U.S.C. Sec. 1371(a)(3)(A) (1976-1982) (emphasis added).
 
 
 35
 We believe that section 1381 of the MMPA, which expressly included an observer program, provided the Secretary with a model of Congress' view as to what was necessary to carry out the purposes of the statute.
 
 
 36
 The Captains' second argument is that since the House approved a bill in May of 1977[13] that explicitly authorized the use of observer data for enforcement purposes, but the Senate did not act upon it, congressional disapproval must be inferred. The House Oversight Committee, however, was well aware of the continued existence of the observer program and the fact that the Senate might not act on the bill.[14] The Committee was informed that existing funds were not adequate to staff all such vessels. Committee members expressed concern that the bill, which would have authorized additional funding for the observer program to staff all vessels with a capacity of four hundred or more tons,[15] might not be acted upon by Congress. This concern stemmed from the discrepancy in numbers of porpoise mortalities reported by observed and unobserved vessels and the belief that the observer program was the only means of obtaining accurate information.[16] We have found nothing in the 1977 or 1978 hearings of the Oversight Committee that suggests that the Committee disapproved of the collection of compliance data. When Congress amended the MMPA in 1981, it did nothing to alter Secretary's power to continue the existence of the observer program. Thus, we conclude that the mere failure of the bill to be enacted does not demonstrate congressional disapproval of the observer program. Cf. American Trucking Association v. U.S., 344 U.S. 298, 309 n. 10, 73 S.Ct. 307, 314 n. 10, 97 L.Ed. 337 (1952) (fact that Act as originally drafted defined commerce to include leasing but lease terminology was stricken was of no consequence to Interstate Commerce Commission's implied power to regulate leasing practices).
 
 
 37
 The Captains also contend that the observer program exceeds the Secretary's rule-making authority under the MMPA because section 1377 narrowly defines the acceptable enforcement procedures. The observer program is said to be in direct conflict with section 1377, which allows warrantless searches if there exists reasonable cause to believe a vessel is in violation of the MMPA. We disagree.
 
 
 38
 Section 1377 provides that "the Secretary shall enforce the provisions" of the MMPA, 16 U.S.C. Sec. 1377(a). The statute provides further that its provisions concerning enforcement by arrest, search and seizure, are "in addition to any other authority conferred by law[.]" 16 U.S.C. Sec. 1377(d). Thus, section 1377 does not limit enforcement procedures to those expressly authorized in that section. The regulation prescribing the observer program comes within the meaning of "other authority conferred by law" as used in section 1377.
 
 CONSTITUTIONALITY OF THE REGULATION
 
 39
 The Captains contend that the regulation authorizes a warrantless search in violation of the fourth amendment.
 
 
 40
 Whether the observer program constitutes a search is a question which is not free from doubt. This circuit has held that not every boarding of a vessel constitutes a search. United States v. Olander, 584 F.2d 876, 888 (9th Cir.1978) (boarding to serve process is not a search), vacated on other grounds sub nom. Harrington v. United States, 443 U.S. 914, 99 S.Ct. 3104, 61 L.Ed.2d 878 (1979). A search within the meaning of the fourth amendment involves governmental prying into hidden places for that which is concealed by persons exhibiting a "legitimate expectation of privacy." See Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). The regulation does not authorize an inspection of private papers, nor a search of the person, or the personal effects of the Captains or their crews. Instead, the observers must confine their observations to the fishing operations of the vessel, which occur on the open sea or on deck. Thus, the information they may gather is restricted to evidence which is in plain view. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. 347 at 351, 88 S.Ct. 507 at 511, 19 L.Ed.2d 576 (1967). See United States v. Whitmire, 595 F.2d 1303, 1312 (5th Cir.1979), (high levels of privacy might be accorded to crews living quarters on tanker that travels for months, but no crew member has legitimate claim of privacy on open deck of a fishing smack or in the hold of a cargo vessel available for hire), cert. denied, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980).
 
 
 41
 It can be argued with equal force, however, that the observer's constant surveillance of the activities of the Captains and their crews, for a prolonged period of time, constitutes an intrusion into liberty and privacy interests, protected by the fourth amendment, by exposing "what [a person] seeks to preserve as private, even in an area accessible to the public." Katz, 389 U.S. at 351, 88 S.Ct. at 511.
 
 
 42
 We need not pause to resolve this nice question. Even if we assume that the regulation authorizes a warrantless search of the operations of a fishing vessel, it is our view that the regulation requiring the presence of observers on purse seiners does not violate the fourth amendment.
 
 
 43
 The fourth amendment prohibits unreasonable searches and seizures. Warrantless searches may be reasonable under certain circumstances. See, e.g., Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914) (search incident to a lawful arrest); Carroll v. United States, 267 U.S. 132, 146, 45 S.Ct. 280, 282-83, 69 L.Ed. 543 (1925) (search of vehicles based on probable cause that contraband is being carried); South Dakota v. Opperman, 428 U.S. 364, 367-76, 96 S.Ct. 3092, 3096-3101, 49 L.Ed.2d 1000 (1976) (inventory search of impounded vehicles without a showing of probable cause); Illinois v. LaFayette, --- U.S. ----, ----, 103 S.Ct. 2605, 2611, 77 L.Ed.2d 65 (1983) (booking search of a man's purse-type shoulder bag); United States v. Villamonte-Marquez, --- U.S. ----, ----, 103 S.Ct. 2573, 2582, 77 L.Ed.2d 22 (1983) (boarding of vessels without articulable suspicion). In Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1924), the Supreme Court commented: "Under the common law and agreeably to the Constitution [a] search may in many cases be legally made without a warrant. The Constitution does not forbid search, as some parties contend, but it does forbid unreasonable search." 267 U.S. at 146, 45 S.Ct. at 282.
 
 
 44
 The Supreme Court has recognized that warrantless searches in closely regulated industries can be reasonable. The Court has held that warrantless inspections are reasonable if they are reasonably necessary to further important federal interests and the federal regulatory presence is sufficiently comprehensive and predictable that "the assurance of regularity provided by a warrant is rendered unnecessary." Donovan v. Dewey, 452 U.S. 594, 599-602, 101 S.Ct. 2534, 2538-40, 69 L.Ed.2d 262 (1981).[17] The Court has applied the exception where the business premises searched are part of an industry "long subject to close supervision and inspection." Colonnade Catering Corp. v. United States, 397 U.S. 72, 76-77, 90 S.Ct. 774, 776-77, 25 L.Ed.2d 60 (1970); see also United States v. Raub, 637 F.2d 1205, 1208 (9th Cir.1980) ("One of the recognized exceptions to the warrant requirement is for administrative searches of enterprises that traditionally have been closely regulated."). In Marshall v. Barlow's, Inc., 436 U.S. 307, 313, 98 S.Ct. 1816, 1820-21, 56 L.Ed.2d 305 (1978), the Court observed that certain industries have had such a history of close governmental supervision that no reasonable proprietor entering into them could have a justifiable expectation of privacy. In United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), the Court extended the pervasively regulated industry exception to industries without a long tradition of regulation where frequent unannounced inspections are essential to further an important governmental interest.
 
 
 45
 Where the regulation involves a comprehensive and predictable governmental presence, the owner "is not left to wonder about the purposes of the inspector or the limits of his task." 406 U.S. at 316, 92 S.Ct. at 1596. The Court has also noted that where the industry is closely regulated, the owner cannot help but be aware that the government will conduct periodic inspections for specific purposes. Donovan v. Dewey, 452 U.S. 594, 600, 101 S.Ct. 2534, 2538-39, 69 L.Ed.2d 262 (1981). The reasonableness of a search in a closely regulated industry does not depend on the existence of probable cause but rather on the "pervasiveness and regularity of the federal regulations." 452 U.S. at 606, 101 S.Ct. at 2542. When a person chooses to engage in a closely regulated industry and to accept a license which is conditioned upon such warrantless intrusion and inspection, he does so with full knowledge of the restrictions on his privacy. He is also free not to submit to such regulation and warrantless inspection by declining to seek a federal permit. Biswell, 406 U.S. at 315-16, 92 S.Ct. at 1596.
 
 
 46
 The Captains argue that the closely regulated industry exception does not apply to a warrantless administrative search unless it is expressly authorized by Congress. This argument was presented and rejected by the court in United States v. Rucinski, 658 F.2d 741 (10th Cir.1981), cert. denied, 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 649 (1982). It is quite true that in each of the cases cited above where the Supreme Court determined that a warrantless search of a closely regulated industry was reasonable under the fourth amendment, the entry was expressly authorized by statute. The Captains assume that since the Supreme Court has held that a warrantless search of a closely regulated industry is reasonable when expressly authorized by Congress, the search of such a business violates the fourth amendment if it is conducted pursuant to a regulation impliedly authorized by Congress. No authority is cited for this novel constitutional proposition. The law is to the contrary. Congress cannot authorize conduct which violates the fourth amendment. The proper inquiry when a warrantless search is challenged is whether it is authorized by the fourth amendment--not by an act of Congress.
 
 
 47
 In Raub, this court noted that "[c]ommercial fishing has a long history of being a closely regulated industry." 637 F.2d at 1208 (footnote omitted). Regulation of the fishing industry began in 1793. Id. at 1209 n. 5. Since 1972, the tuna industry has been closely regulated by Congress because its fishing operations threatened the extinction of the porpoise. Congress' interest in the protection of marine mammals was made known to all commercial fishermen in 1972 when Congress expressly authorized the placing of observers on purse seiners to protect the porpoise under the MMPA. As discussed above, in the MMPA, Congress authorized the Secretary to prescribe regulations and to issue a permit restricting the taking of marine mammals. Congress also authorized the Secretary to limit the issuance of permits to those persons who can demonstrate that any taking of marine mammals will be consistent with the MMPA, 16 U.S.C. Sec. 1373. Thus, commercial fishermen have been made aware since 1972 that to take porpoise they must have a permit which is subject to conditions that will insure that marine mammals are given the protection required by Congress. The statutory observer program had been one such condition. Since 1974 commercial fishermen have also been aware of the regulation which prescribes the observer program. Any tuna boat Captain who does not wish to expose himself to the observation of his open deck activities is free not to submit to such an intrusion by refraining from seeking a permit. See Biswell, 406 U.S. at 315-16, 92 S.Ct. at 1596. See also Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971) (a welfare recipient may avoid an entry into his home by refusing to accept public assistance).
 
 
 48
 In determining whether warrantless searches in a closely regulated industry are reasonable we must decide whether the regulatory scheme "in terms of the certainty and regularity of its application, provides a constitutionally adequate substitute for a warrant." Dewey, 456 U.S. at 603, 101 S.Ct. at 2540. It is evident to us that the observer program regulation provides an adequate substitute for a warrant for several reasons.
 
 
 49
 First, the MMPA, the regulation, and the National Marine Fisheries Services' (NMFS) Manual establish a predictable and guided federal presence and limit the scope of the data collection. The MMPA delegates to the Secretary the authority to waive the moratorium on porpoise takings only when he can determine that such takings will not disadvantage protected species. The MMPA specifically sets forth permissible restrictions on the takings of porpoises and authorizes the Secretary to impose additional ones. The Act also requires publication of proposed regulations, and clearly defines its objectives and purposes.
 
 
 50
 Under the observer program, vessel owners are sent advance calendars of scheduled observer trips. This notification includes a statement of the significant regulations promulgated by the Secretary. The regulation, 50 C.F.R. Sec. 216.24(f), limits the scope of observer activities to data collection. The National Marine Fishery Service Field Manual further defines the data collection activities of individual observers. The 1979 Manual informs observers that they are not enforcement agents and they are not "to record extraneous comments, editorials, or personal opinions ... or evaluate or interpret data." Observers are instructed simply to record the data called for in the form. The Manual, which is available to the industry, contains sections on the observer's responsibilities, instructions to the observers, and standardized forms to record information. The 1981 Manual additionally establishes a predeparture conference between the owner, master, observer, and an agency official to ensure a common understanding of the scope of observers' activities.
 
 
 51
 Second, the regulation requires that tuna vessel owners be given advance notice of the stationing of an observer on their vessel. Thus, the surprise element of many warrantless inspections is lacking here. See, e.g., Delaware v. Prouse, 440 U.S. 648, 657, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660 (1979). This advance notice also provides the Captains with an opportunity to seek judicial review of a particular scheduled observer trip. Cf. Dewey, 452 U.S. at 604-05, 101 S.Ct. at 2541 (opportunity for judicial review is factor important in reasonableness determination). They are also free to request a court order accommodating any privacy interests that may need protection. We conclude that the regulation as limited by the field manual provides a constitutionally adequate substitute for a warrant.
 
 
 52
 Use of observers advances the legitimate government interest of meaningful protection of the porpoise population, while the safeguards built into the observer program insure that there will be no significant intrusion on the Captains' fourth amendment interests. Cf. Delaware v. Prouse, 440 U.S. at 654, 99 S.Ct. at 1396 (constitutionality of a law enforcement procedure is basically tested by balancing its intrusion on fourth amendment interests against its promotion of legitimate government interests).
 
 
 53
 The Captains ask us to invalidate the observer program on the ground that a less restrictive alternative for obtaining the information exists. The government's affidavit, however, demonstrates that the suggested techniques--aerial surveillance and the like--are prohibitive in terms of cost and are ineffective in terms of data collection necessary for the Secretary to waive the moratorium on takings of porpoise and to issue permits. Cf. Wyman, 400 U.S. at 322, 91 S.Ct. at 388 (although secondary sources might be helpful, they would not always assure identification of information required for receipt of benefits).
 
 
 54
 In Villamonte-Marquez, the Court noted that the nature of water borne commerce in waters providing ready access to the open sea is sufficiently different from the nature of vehicular traffic on highways so as to make possible alternatives to the boarding of a vessel less likely to accomplish essential governmental procedures. --- U.S. at ----, 103 S.Ct. at 2581.
 
 CONCLUSION
 
 55
 We hold that the requirement that observers be permitted to board purse seiners on a scheduled basis as a condition of obtaining a permit to take porpoise is reasonable under the fourth amendment. The regulation and the field manual do not authorize the observers to conduct searches of the persons, personal effects, or living quarters of the Captains and their crews. Such a search would have to be justified independently under the fourth amendment.
 
 
 56
 The judgment in Balelo is reversed and remanded for further proceedings consistent with this opinion. The judgment in Gladiator is affirmed.
 
 PREGERSON, Circuit Judge, concurring:
 
 57
 I concur in the majority's opinion but write separately to say that the observer program does not constitute a "search" within the meaning of the fourth amendment.
 
 
 58
 Fourth amendment protection operates when two conditions are met. First, a person must have exhibited an expectation of privacy in the place where the Government has allegedly intruded. Second, this expectation must be one that a free society is prepared to recognize as reasonable. Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516-17, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).
 
 
 59
 The tuna boat captains have failed to meet either condition. They conduct fishing operations at sea on decks covered only by the sky and open to view by other crew members, nearby vessels, and overflying aircraft.
 
 
 60
 Moreover, our society is not prepared to recognize an expectation of privacy on open tuna boat decks, which are really no different from work areas in any industry the Government regulates to safeguard the public health and welfare. Federal inspectors, without impinging on any reasonable expectation of privacy, routinely monitor work areas in the coal mining, Donovan v. Dewey, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (Federal Mine Safety and Health Act of 1977), firearms, United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (Gun Control Act of 1968), and salmon fishing, United States v. Raub, 637 F.2d 1205 (9th Cir.1980) (Sockeye Salmon Fishing Act of 1947), industries, to name just a few.
 
 
 61
 In the final analysis, I think the question whether a governmental intrusion into a private area constitutes a reasonable search under the fourth amendment depends on the kind and degree of intrusion that a free society is willing to tolerate. United States v. Solis, 393 F.Supp. 325, 328 (C.D.Cal.1975) (Pregerson, J.), aff'd in relevant part, 536 F.2d 880 (9th Cir.1976). With few exceptions, our society does not tolerate warrantless intrusions into private dwellings and offices. E.g., Camara v. Municipal Court, 387 U.S. 523, 528-29, 87 S.Ct. 1727, 1730-31, 18 L.Ed.2d 930 (1967). But the presence on open decks of government scientists monitoring commercial fishing operations to save the porpoise from extinction is the kind and degree of intrusion that our society should tolerate.
 
 NELSON, Circuit Judge, concurring:
 
 62
 If hard cases make bad law, I fear the result of cases such as this. I write specially to reveal the extraordinary difficulties I find in this case, and to explain its limited applicability.
 
 
 63
 First, I would make explicit that the search involved here is overwhelmingly intrusive. Stationing an observer on a small boat for months at a time is both a search and a massive invasion of privacy. Thus, when I balance the need for government regulation with the degree of intrusion in this case, I find both sides of the scale weighted heavily. I would not simply "assume arguendo" that this is a search, but would call it by its name and treat it accordingly.
 
 
 64
 Warrantless searches are presumptively unreasonable. See, e.g., Camara v. Municipal Court, 387 U.S. 523, 528-29, 87 S.Ct. 1727, 1730-31, 18 L.Ed.2d 930 (1967). The pervasively regulated industry exception is narrowly crafted, and should be limited as much as possible. See See v. City of Seattle, 387 U.S. 541, 543, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). It is only because I view a commercial fishing vessel to be a workplace (unlike, say, a house boat or a recreational boat) that I am willing to apply the exception here. Even then, however, I am wary of permitting warrantless searches of residences that double as workplaces. But for the unique inaccessibility of ships at sea, I would not permit a warrantless search. See United States v. Villamonte-Marquez, --- U.S. ----, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983).
 
 
 65
 Second, I write to emphasize the magnitude of the governmental interest involved in this case. If the world loses genetic diversity, it has truly suffered irreparable harm. Marine mammals have long been threatened by the onslaught of technology; if we must take drastic steps to avoid further encroachment, so be it.
 
 
 66
 Last, I am struck by the precautions the government has taken to limit the intrusiveness of the observer program. The regulatory scheme is detailed; the inspectors can report about porpoises and nothing more; absolutely no alternative method of enforcement exists. Under these circumstances, I hesitantly concur. Were the situation less compelling in any respect, I would not.
 
 
 67
 TANG, Circuit Judge, with whom FERGUSON, Circuit Judge, joins, and with whom CANBY, Circuit Judge, joins in Part II, dissenting:
 
 
 68
 I respectfully dissent. In my view the challenged regulation is not authorized by Congress and the provision for warrantless searches offends the Constitution.
 
 
 69
 * The regulation, 50 C.F.R. Sec. 216.24(f), establishes an indefinite policy of stationing federal observers aboard tuna boats for enforcement as well as research purposes. Because Congress expressly restricted the use of observers to the two-year period following passage of the Act and limited the function of such officials to research and scientific observation, this regulation goes far beyond the design of the statute it purports to implement.
 
 
 70
 Regulations promulgated pursuant to an enabling statute will be upheld if they are reasonably related to the purposes of the enabling legislation, Mourning v. Family Publication Service, Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973), but such regulations will not be sustained when they are contrary to congressional design. "The rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law. Rather, it is 'the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.' " Ernst & Ernst v. Hochfelder, 425 U.S. 185, 213-14, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976) (quoting Manhattan General Equipment Co. v. Commissioner, 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936)). Thus, "our primary task when testing the statutory authority of a challenged regulation must always be to determine the intent of Congress." State of California v. Block, 663 F.2d 855, 860 (9th Cir.1981).
 
 
 71
 In this case, the language of the statute and its legislative history both indicate that Congress intended to restrict the use of on-board observers to the two-year period following passage of the Act.
 
 16 U.S.C. Sec. 1381 provided:
 
 72
 [a]fter timely notice and during the period of research provided in this section, duly authorized agents of the Secretary are hereby empowered to board and to accompany any commercial fishing vessel ... on a regular fishing trip for the purpose of conducting research or observing operations in regard to the development of improved fishing methods and gear as authorized by this section. 16 U.S.C. Sec. 1381(d) (1976). (emphasis added)The period of research referred to in Sec. 1381(d) covered "the full twenty-four calendar month period following October 21, 1972," after which the results of such research were to be reported to Congress. 16 U.S.C. Sec. 1381(a). Funding for the observer program was also limited to the two-year period provided in the statute. The statutory objective was to use the observers as part of "a program of research and development for the purpose of devising improved fishing methods and gear so as to reduce to the maximum extent practicable the incidental taking of marine mammals in connection with commercial fishing." 16 U.S.C. Sec. 1381(a). Congress clearly expressed its intent to use the observers only as part of a short term research program. The majority, however, sanctions the agency's administrative decision to transform one part of a limited research program into an ongoing regulatory policy of indefinite duration.
 
 
 73
 The legislative history of the observer program underscores the two-year limitation as part of the Act's congressional design. Section 1381 of the Act originated as a Senate amendment. The Senate report indicates that Congress intended the observer research and development program to terminate two years after passage of the Act. The majority is simply incorrect when it suggests that the observer program was merely a model after which a regulatory observer policy could be patterned. "The committee has authorized a $2 million, 2-year program to devise new methods of netting and tuna boat operating procedures which will reduce the killing of marine mammals. The committee has provided a 2-year period because it is believed that science can come up with new systems within that time." S.Rep. No. 863, 92nd Cong., 2d Sess. 9-10 (1972). At the end of the two-year period, the best available fishing methods, if feasible, were to be mandated on commercial fishing vessels, S.Rep., supra at 21. The research program, including its $2 million appropriation and federal observer component, was restricted to a two-year period in clear and explicit terms. Neither the statutory language nor the legislative history of the observer program hint that the agency retained any discretion to extend the use of on-board observers beyond the explicit two-year period.
 
 
 74
 In addition to its unauthorized extension of the operative period for the observer program, the regulation also expands the function of the government observers beyond the research component contemplated by Congress by enlisting them as inspection and enforcement officials. When Congress created the two-year observer program, it expressly stated that the observer presence was a research tool aimed at "the development of improved fishing methods and gear as authorized by this section." 16 U.S.C. Sec. 1381(d). The regulation, however, extends the duration of the observer presence indefinitely and transforms the observers from mere researchers into enforcement officers who collect information for use against the fishermen in civil and criminal actions. To label them now merely "observers" is an understatement. They are now federal inspectors who maintain constant surveillance to ensure that fishermen comply with federal law. The majority is correct to say this is probably the most efficient way to guarantee that the fishermen fish by the rules, but it is not what Congress provided. The observer program was not developed in a spirit of expediency. If Congress contemplated the use of live-in observers for enforcement purposes, it could have expressly provided for such a function in the observer statute or at least granted the Secretary the discretion to create additional functions for the observers.
 
 
 75
 Instead, Congress specifically addressed the methods of enforcing the statutory scheme in Sec. 1377 of the Act, which allows warrantless searches of vessels only if there is "reasonable cause to believe" that a vessel or crew member is violating the Act or its regulations. 16 U.S.C. Sec. 1377(d).[1] Hence, the very structure of the Act itself--indeed its own language--indicates that Congress did not envision warrantless searches by on-board observers as an enforcement mechanism. The majority, however, seizes on that part of the language of Sec. 1377 which suggests that the enforcement measures it authorizes are "in addition to any other authority conferred by law." 16 U.S.C. Sec. 1377(d). The majority asserts that this language indicates that Congress vested the Secretary with the power to create additional enforcement measures even in contravention of the express statutory limitations of Sec. 1377. Under the majority's reading of the statute, the Secretary, apparently without limitation, may abrogate the explicit search and seizure restrictions of Sec. 1377 and effectively render most of that section a nullity. Beyond the fact that neither the plain language of the statute nor its legislative history substantiates such an interpretation, the majority's reading defies basic principles of statutory construction because "acceptance of that meaning would lead to absurd results ... or would thwart the obvious purpose of the statute." Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978) (quoting Commissioner v. Brown, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965)). This self-emasculating interpretation of Sec. 1377 is contrary to the presumption against reading a statute in a manner which renders it ineffective. F.T.C. v. Manager, Retail Credit Co., 515 F.2d 988, 995 (D.C.Cir.1975). The majority's reading of Sec. 1377 exaggerates the language of a single phrase to eviscerate the statute's internal enforcement scheme, a scheme that was designed to enforce the Act without disregarding the privacy concerns of those who would be subject to it.
 
 
 76
 The majority suggests that subsequent congressional inaction infers approval of the way observers are used under the regulation. Such inaction is not a helpful indicator of congressional intent when the statutory language itself suggests a contrary interpretation. S.E.C. v. Sloan, 436 U.S. 103, 117, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978). When Congress has squarely faced the propriety of a regulatory measure, congressional non-action may be evidence of congressional approval. Bob Jones University v. United States, --- U.S. ----, 103 S.Ct. 2017, 2033, 76 L.Ed.2d 157 (1983). Absent such direct consideration, however, "[n]on-action by Congress is not often a useful guide..." Bob Jones University, supra, at 2033.
 
 
 77
 The majority attempts to bolster its finding of congressional approval by noting that Congress has amended the Act without disturbing the Secretary's use of on-board observers. This argument is unpersuasive because the on-board observer program was not specifically addressed in subsequent legislative action. Indeed, the Supreme Court recently rejected such an argument in Aaron v. S.E.C., 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). There, the Court refused to adopt an agency's statutory interpretation which was premised on congressional failure to disturb that interpretation in subsequent legislative amendments to the authorizing act. "[S]ince the legislative consideration of those statutes was addressed principally to matters other than that at issue here, it is our view that the failure of Congress to overturn the Commission's interpretation falls far short of providing a basis to support a construction of Sec. 10(b) so clearly at odds with its plain meaning and legislative history." Id. at 694, n. 11, 100 S.Ct. at 1954, n. 11.
 
 
 78
 Because the plain language of Sec. 1381 and its legislative history demonstrate that the on-board observer program was limited to research duties during the two-year period following passage of the Act, the Secretary's regulation adopting an indefinite policy of on-board observers for enforcement purposes as well as research is unauthorized.
 
 II
 
 79
 The absence of statutory authorization, however, is only one basis for finding this regulation invalid. The regulation also offends the Constitution because it empowers federal inspectors to conduct searches in violation of the fourth amendment.
 
 
 80
 The majority, in its discussion of the regulation's fourth amendment impact, sidesteps and fails to confront the threshold question of whether the intrusiveness of stationing government observers on private fishing vessels for extended periods constitutes a search. The majority suggests that the observer policy may not constitute a search within the meaning of the fourth amendment because the government officials confine their observations to the open deck or open sea. This understates the actual operation of the observers. They are more than mere passive onlookers; they are uninvited government inspectors who live with the crew for weeks at sea, watching all aspects of fishing operations, conducting research and collecting data and information that may be used against the tuna fishermen in civil and criminal proceedings. This is not "a brief detention where officials come on board, visit public areas of the vessel, and inspect documents." United States v. Villamonte-Marquez, --- U.S. ----, 103 S.Ct. 2573, 2581, 77 L.Ed.2d 22 (1983). This regulation places live-in government inspectors on private vessels for surveillance purposes over a period of months and results in the type of governmental invasion that is well within the protection of the fourth amendment. Despite the majority's ambivalence on this issue, the use of government inspectors under the regulation is a search within the meaning of the fourth amendment. As such, it is presumptively unconstitutional in the absence of a warrant, and "[t]he burden is on the government to prove that the departure from the warrant requirement was justified." United States v. Martin, 693 F.2d 77, 78 (9th Cir.1982) (per curiam); Coolidge v. New Hampshire, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971).
 
 
 81
 The majority decides, however, that even if this use of observers constitutes a search, it is reasonable because it falls within the pervasively regulated industry exception to the warrant requirement. The majority suggests that because the tuna fishing industry has been subject to government regulation, the acceptance of federal observers must be part of the regulatory burden that goes with the benefit of tuna fishing. The majority ventures into uncharted territory, however, because the Supreme Court has admonished that the regulated industry exception is a narrow one, one that neither the Supreme Court nor this court has ever embraced in the absence of explicit statutory authorization for the warrantless search scheme it purports to justify. Moreover, the regulated industry exception has never been used to justify warrantless surveillance schemes such as the one in this case. Until now, the exception has only applied to warrantless inspections of particular businesses on a periodic basis. The majority breaks new ground by applying the exception to warrantless surveillance schemes conducted for days and months at a time.
 
 
 82
 In regulated industry cases, warrantless searches are still presumptively unreasonable and the government retains the burden of justifying its disregard for the warrant requirement. Marshall v. Barlow's Inc., 436 U.S. 307, 312-13, 98 S.Ct. 1816, 1820-21, 56 L.Ed.2d 305 (1978). "The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." Id., at 312, 98 S.Ct. at 1820 (quoting See v. Seattle, 387 U.S. 541, 543, 87 S.Ct. 1737, 1739, 18 L.Ed.2d 943 (1967)). In this case, the government has failed to meet its burden of justifying the warrantless intrusions which the challenged regulation authorizes.
 
 
 83
 Under the pervasively regulated industry exception, a warrant may not be required "when Congress has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the federal regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." Donovan v. Dewey, 452 U.S. 594, 600, 101 S.Ct. 2534, 2539, 69 L.Ed.2d 262 (1981). While planting government observers on fishing vessels for the duration of the expeditions may offer the most efficient method of policing the Act, enthusiasm for this enforcement technique should not obscure the essential constitutional requirement that the warrantless quality of such a procedure must be vital to the regulatory scheme. The government has not proffered any convincing explanation why waiver of the warrant requirement is essential to the enforcement of the Act or to the effective implementation of the observer program.
 
 
 84
 In Donovan v. Dewey, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981), the Supreme Court upheld a warrantless search scheme under the Federal Mine Safety and Health Act of 1977, 30 U.S.C. Sec. 813(a) (1976). The statute allowed federal mine inspectors to make unannounced inspections of underground mines four times a year and surface mines twice a year. The Court noted that a warrant requirement could frustrate such an inspection scheme because unannounced inspections were needed to effectuate the scheme's objective of deterring hazardous mine conditions. Id. at 603, 101 S.Ct. at 2540. In United States v. Kaiyo Maru No. 53, 699 F.2d 989 (9th Cir.1983), this court upheld a warrantless search scheme designed to enforce the Fishery Conservation and Management Act. 16 U.S.C. Sec. 1861(b). The court concluded that dispensing with the warrant requirement for Coast Guard inspections of fishing boats in the Fishery Conservation Zone was necessary due to the logistical barriers of obtaining a warrant for ships at sea. Id. at 995.
 
 
 85
 A comparable element of necessity is missing in this case. The regulation authorizes boarding by federal observers at the time of departure and provides for notification of the observer presence several days before the expedition begins. After they are aboard, the observers make their observations and inspections throughout the duration of the fishing trip. Nothing in this procedure indicates that a warrant requirement would frustrate the objectives of the regulatory search scheme. Research and observation activities under the regulatory procedure can be conducted in the same manner whether or not a warrant is obtained. Although a warrant requirement in this case might be an administrative annoyance, the inconvenience it poses is an insufficient basis to "vitiate the general constitutional requirement that for a search to be reasonable a warrant must be obtained." Marshall, 436 U.S. at 324, 98 S.Ct. at 1827. Moreover, a warrant requirement pursuant to a regulatory search scheme need not be based on evidence of specific violations or actions on particular boats. A warrant requirement in this context would be designed to ensure governmental compliance with reasonable legislative and regulatory standards for the frequency and scope of the search operation. Id. at 320, 98 S.Ct. at 1824; Camara v. Municipal Court, 387 U.S. 523, 538, 87 S.Ct. 1727, 1735-36, 18 L.Ed.2d 930 (1967). Such a requirement preserves the historic function of checking the potential for arbitrary government conduct without frustrating the legitimate objectives of the Marine Mammal Protection Act. This balance is especially important as virtually all guidelines regarding the conduct of the observer operation emanate from internal agency policies instead of statutory or regulatory guidelines with force of law.
 
 
 86
 As the reasonableness of a regulatory search scheme "depends on the specific enforcement needs and privacy guarantees of each statute," Kaiyo Maru No. 53, 699 F.2d at 995, and as the burden of demonstrating the need to by-pass the warrant requirement rests with the government, the absence of any persuasive proof that warrantless searches are necessary calls for adherence to the general rule instead of the exception. A warrant is required for this regulatory search scheme.
 
 III
 
 87
 Because 50 C.F.R. Sec. 216.24(f) exceeds congressional authorization and establishes a search scheme in violation of the fourth amendment of the Constitution, I dissent.
 
 FERGUSON, Circuit Judge, dissenting:
 
 88
 Today the majority installs a federal agent in the temporary home of 14 to 18 fishermen for a two- to three-month period without requiring a warrant or a showing of probable cause to believe that the law has been broken. The fourth amendment, assuring that the people are to be secure in their homes, mandates that warrantless government intrusion into even a temporary home is per se unreasonable. This protection is not lost because the place called home is also used for commercial purposes, i.e. as a fishing vessel, for both commercial premises and seafaring vessels are covered by the fourth amendment.
 
 
 89
 The National Oceanic and Atmospheric Administration (NOAA), an agency of the federal government, has by regulation placed federal agents on board tuna fishing vessels for two- to three-month fishing trips by conditioning the license to fish for tuna upon the vessel owner's consent to the presence of federal observers. 50 C.F.R. Sec. 216.24(f) (1982). The federal "observers" are authorized to conduct research and collect information "which may be used in civil or criminal penalty proceedings, forfeiture actions, or permit or certificate sanctions," id. Sec. 216.24(f)(1), while they live for the extended fishing trip on a 150- to 250-foot boat with the crew of 14-18 men. M.K. Orbach, Hunters, Seamen, and Entrepreneurs (1977) (hereinafter "Orbach"). It has been stipulated by the parties that the observers take their meals with the fishermen, are not confined to any particular areas of the vessel, and are expected to "maintain open communication" with and question vessel operators and other personnel while recording data pertaining to the enforcement of the Marine Mammal Protection Act, 16 U.S.C. Secs. 1361-1407.
 
 
 90
 Any possibility of separating the business aspects of a fishing vessel from the home aspects is belied by the realities of life on such a vessel:
 
 
 91
 [I]t is impossible to get more than about 50 feet from any of the other 15 men with whom you are going to spend the next two months. You can draw curtains or close doors and remain out of sight a good part of the time, but you can never get away from them, and the fishing process forces you into regular interaction with them.
 
 
 92
 Orbach at 25 (emphasis in original). Both Congress and the Supreme Court have acted to specially protect the rights and comforts of seamen due to this unusual characteristic of their work. See Aguilar v. Standard Oil Co., 318 U.S. 724, 732, 63 S.Ct. 930, 934-35, 87 L.Ed. 1107 (1943) ("Of necessity, during the voyage [the seaman] must eat, drink, lodge and divert himself within the confines of the ship. In short, during the period of his tenure the vessel is not merely his place of employment; it is the framework of his existence."); Isbrandtsen Co. v. Johnson, 343 U.S. 779, 782, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952); Warner v. Goltra, 293 U.S. 155, 162, 55 S.Ct. 46, 49, 79 L.Ed. 254 (1934), ( "[T]he maritime law by inveterate tradition has made the ordinary seaman a member of a favored class.").
 
 
 93
 The NOAA's effort to install a federal agent on board a fishing vessel without securing a warrant based on probable cause is reminiscent of the "indiscriminate searches and seizures conducted under the authority of 'general warrants' [which] were the immediate evils that motivated the framing and adoption of the Fourth Amendment." Payton v. New York, 445 U.S. 573, 583, 100 S.Ct. 1371, 1378, 63 L.Ed.2d 639 (1980); Marshall v. Barlow's, Inc., 436 U.S. 307, 311, 98 S.Ct. 1816, 1819-20, 56 L.Ed.2d 305 (1978). The fourth amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects...." The Supreme Court has defined the scope of the fourth amendment to include a person's "reasonable expectation of privacy." Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Such a definition extends fourth amendment protections beyond the literal meaning of "houses" to temporary residences, such as a hotel, Stoner v. California, 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964), a rooming house, McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948), and even a mobile home, People v. Carney, 34 Cal.3d 597, 194 Cal.Rptr. 500, 668 P.2d 807 (1983) and to commercial premises, Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 329, 99 S.Ct. 2319, 2326, 60 L.Ed.2d 920 (1979) (adult bookstore); Mancusi v. DeForte, 392 U.S. 364, 367, 88 S.Ct. 2120, 2123, 20 L.Ed.2d 1154 (1968) (office); See v. City of Seattle, 387 U.S. 541, 543, 87 S.Ct. 1737, 1739, 18 L.Ed.2d 943 (1967) (warehouse), as well as to seafaring vessels, United States v. Villamonte-Marquez, --- U.S. ----, 103 S.Ct. 2573, 2581, 77 L.Ed.2d 22 (1983), and automobiles, Delaware v. Prouse, 440 U.S. 648, 662-63, 99 S.Ct. 1391, 1400-01, 59 L.Ed.2d 660 (1979). More important, the "Fourth Amendment protects people, not places," Katz v. United States, 389 U.S. at 351, 88 S.Ct. at 511, and thus prohibits warrantless surveillance of a person's ordinarily private actions and words. Id; United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134-35, 32 L.Ed.2d 752 (1972). As the Court stated over twenty years ago:
 
 
 94
 At the very core [of the fourth amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion. This Court has never held that a federal officer may without warrant and without consent physically entrench into a man's office or home, there secretly observe or listen, and relate at the man's subsequent criminal trial what was seen or heard.
 
 
 95
 Silverman v. United States, 365 U.S. 505, 511-12, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961) (citations omitted). It is precisely this "right to be let alone," Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), that is trampled when tuna fishermen are required to live, eat, sleep, lodge and relax in the presence of a federal agent within the confines of a 150- to 250-foot boat in the middle of the ocean for two to three months at a time.
 
 
 96
 The fourth amendment provides that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause ... particularly describing the place to be searched, and the persons or things to be seized." A warrantless search is presumptively unreasonable. Payton v. New York, 445 U.S. at 586 n. 25, 100 S.Ct. at 1380 n. 25; Marshall v. Barlow's, Inc., 436 U.S. at 312, 98 S.Ct. at 1820; United States v. United States District Court, supra. If the reasonableness of a search could be based "on little more than a subjective view regarding the acceptability of certain sorts of police conduct, and not on considerations relevant to Fourth Amendment interests ... Fourth Amendment protection in this area would approach the evaporation point." Chimel v. California, 395 U.S. 752, 764-65, 89 S.Ct. 2034, 2041, 23 L.Ed.2d 685 (1969). Rather, "a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant" or falls within one of carefully defined exceptions to the warrant requirement. Camara v. Municipal Court, 387 U.S. 523, 528-29, 87 S.Ct. 1727, 1730-31, 18 L.Ed.2d 930 (1967). This rule must be strictly enforced as "[t]he right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." Id. at 529, 87 S.Ct. at 1731 (quoting Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948)). As shown by Judge Tang in his dissent, the regulation at issue here cannot be justified under any of the recognized exceptions to the warrant requirement, particularly the "pervasively regulated industry" exception.
 
 
 97
 Tuna fishermen do not waive their right to be free from unreasonable search or surveillance by temporarily living onboard a fishing vessel. The fishing boat is not just their place of employment, but for two to three months it is "the framework of [their] existence," Aguilar v. Standard Oil Co., 318 U.S. at 732, 63 S.Ct. at 934, and their home. This home cannot be entered by law enforcement officers absent a warrant based on probable cause to believe that a crime has been or is being committed. It is well established that an administrative regulation which by its terms violates the fourth amendment is unconstitutional and should not be enforced. Marshall v. Barlow's, Inc., supra.
 
 
 98
 The majority states that it is necessary to place federal observers aboard tuna fishing vessels to protect the lives of porpoises. Maj.op., at 760, 761. However, it fails to address the question whether a warrant authorizing the placement of such observers on a case-by-case basis would undercut the objectives of the Marine Mammal Protection Act. Clearly, if a warrant is required under the Marine Mammal Protection Act, those on the fishing vessel upon which an observer may be stationed could conceal no more than they could conceal with the federal agent forced aboard without the prophylatic protections of a warrant issued by a neutral officer. See Marshall v. Barlow's, Inc., 436 U.S. at 323, 98 S.Ct. at 1826. Moreover, the regulation by its own terms undermines the argument that notice would frustrate the objectives of the observer program as it provides that the fishing vessel owner receive notice of the placement of an "observer" five days prior to the voyage. 50 C.F.R. Sec. 216.24(f)(4). Contrary to the majority position (maj.op., at 765), mere knowledge of the existence of a regulatory purpose cannot eliminate one's expectation of privacy, for that would consume the rule against warrantless searches in the exception. Cf. Michigan v. Tyler, 436 U.S. 499, 508, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978).
 
 
 99
 The majority states that the warrantless quartering of a federal agent on a 30-60 day fishing trip is so clearly limited by regulation that the regulation is the substantial equivalent of a warrant. Maj.op. at 765 - 766. However, it has been recognized that when law enforcement officers are lawfully on the premises for limited purposes, the restrictions placed on the scope of their search or duties "may be more theoretical than real." Payton v. New York, 445 U.S. at 589, 100 S.Ct. at 1381. Moreover, the majority's position that the observer may legitimately gather evidence in "plain view" on the ship belies the weight of the limitations placed on the observer by the regulations. Maj.op., at 763. The fishermen are placed in the position of hiding their everyday acts and comments from the federal agent in order to establish and protect their fundamental right to be let alone. See Illinois v. Andreas, --- U.S. ----, 103 S.Ct. 3319, 3327, 77 L.Ed.2d 1003 (1983) (Brennan, J., dissenting). The NOAA has made the price of being a tuna fisherman include the "dread of subjection to an unchecked surveillance power." United States v. United States District Court, 407 U.S. at 314, 92 S.Ct. at 2135.
 
 
 100
 The fourth amendment was a response to the general warrant whereby an officer was authorized to search private premises without evidence of unlawful activity. Marshall v. Barlow's, Inc., 436 U.S. at 311, 98 S.Ct. at 1819-20. Today the majority holds that a federal agent cannot only search a private vessel, but collect data, question fishermen, and live on the vessel for months at a time without the need to secure a warrant based on a legitimate suspicion of unlawful activity. The regulation at issue here can subject "even the most law-abiding citizen" to unprecedented and unjustified government intrusion and surveillance. See Camara v. Municipal Court, 387 U.S. at 530, 87 S.Ct. at 1731. Surely the lives of porpoises cannot be more sacred to us than the right to privacy and freedom from government intrusion protected by the fourth amendment.
 
 
 
 *
 Appeal from the United States District Court for the Southern District of California Gordon Thompson, Jr., District Judge, Presiding
 
 
 **
 Appeal from the United States District Court for the Central District of California Laughlin Waters, District Judge, Presiding
 
 
 [1]
 Defendants-appellants include: the Secretary of Commerce; the Administrators of National Oceanic and Atmospheric Administration (NOAA) and National Marine Fisheries Service (NMFS), the Assistant Administrator for Fisheries; the Environmental Defense Fund, Inc.; and the Defenders of Wildlife
 
 
 [2]
 The Secretary delegated authority to carry out the provisions of the MMPA to the NOAA Administrator and the Assistant Administrator for Fisheries of the NMFS
 
 
 [3]
 See, e.g., 50 C.F.R. Sec. 216.24(a)(1) (1981): which states that:
 No marine mammals may be taken in the course of a commercial fishing operation unless: The taking constitutes an incidental catch ..., a general permit and certificate(s) of inclusion have been obtained and such taking is not in violation of such permit, certificate(s) and regulation.
 Section (c)(2) provides that "[i]n order to receive a certificate of inclusion, the operator shall have satisfactorily completed required training." 50 C.F.R. Sec. 216.25(c)(2) (1981). The certificate of inclusion must be renewed annually.
 
 
 [4]
 50 C.F.R. Sec. 216.3 (1981) provides that:
 "Take" means to harass, hunt, capture, collect, or kill, or attempt to harass, hunt, capture, collect, or kill, any marine mammal, including, without limitation, any of the following: The collection of dead animals, or parts thereof; the restraint or detention of a marine mammal, no matter how temporary; tagging a marine mammal; or the negligent or intentional operation of an aircraft or vessel, or the doing of any other negligent or intentional acts which result in the disturbing or molesting of a marine mammal.
 
 
 [5]
 The testimony quoted by the court is that of Captain Joe Medina who reported the results of a new and old tests and asserted that the problem was "licked." Committee for Humane Legislation, Inc. v. Richardson, 414 F.Supp. at 301 n. 8 (quoting Hearings on H.R. 10420 Before the Subcomm. on Fisheries and Wildlife Conservation of the House Comm. on Merchant Marine and Fisheries, 92d Cong., 1st Sess., part 1, at 348 (testimony of Captain Joe Medina)). Thus, "Congressman Pelly ... proposed a temporary moratorium ... 'to give the tuna fisheries association an opportunity to develop what they indicate is certainly a solution.' " Committee for Humane Legislation, 414 F.Supp. at 301 n. 9 (quoting Hearing on H.R. 10420, supra, at 407)
 
 
 [6]
 16 U.S.C. Sec. 1381 (1976) provides:
 Commercial fisheries gear development
 (a) Research and development program; report to Congress; authorization of appropriations.
 The Secretary of the department in which the National Oceanic and Atmospheric Administration is operating (hereinafter referred to in this section as the "Secretary") is hereby authorized and directed to immediately undertake a program of research and development for the purpose of devising improved fishing methods and gear so as to reduce to the maximum extent practicable the incidental taking of marine mammals in connection with commercial fishing. At the end of the full twenty-four calendar month period following the date of the enactment of this Act [enacted Oct. 21, 1972], the Secretary shall deliver his report in writing to the Congress with respect to the results of such research and development. For the purposes of this section, there is hereby authorized to be appropriated the sum of $1,000,000 for the fiscal year ending June 30, 1973, and the same amount for the next fiscal year. Funds appropriated for this section shall remain available until expended.
 (b) Reduction of level of taking of marine mammals incidental to commercial fishing operations.
 The Secretary, after consultation with the Marine Mammal Commission, is authorized and directed to issue, as soon as practicable, such regulations, covering the twenty-four-month period referred to in section [1371] of this title as he deems necessary or advisable, to reduce to the lowest practicable level the taking of marine mammals incidental to commercial fishing operations. Such regulations shall be adopted pursuant to section 553 of title 5, United States Code. In issuing such regulations, the Secretary shall take into account the results of any scientific research under subsection (a) of this section and, in each case, shall provide a reasonable time not exceeding four months for the persons affected to implement such regulations.
 * * *
 (d) Research and observation.
 Furthermore, after timely notice and during the period of research provided in this section, duly authorized agents of the Secretary are hereby empowered to board and to accompany any commercial fishing vessel documented under the laws of the United States, there being space available, on a regular fishing trip for the purpose of conducting research or observing operations in regard to the development of improved fishing methods and gear as authorized by this section. Such research and observation shall be carried out in such manner as to minimize interference with fishing operations. The Secretary shall provide for the cost of quartering and maintaining such agents. No master, operator, or owner of such a vessel shall impair or in any way interfere with the research or observation being carried out by agents of the Secretary pursuant to this section.
 
 
 [7]
 50 C.F.R. Sec. 216.14(f) (1974), amended by 50 C.F.R. Sec. 216.14(f) (1981) provides in part:
 Any duly authorized agents of the Secretary may from time to time, after timely oral or written notice to the vessel owner ..., board and/or accompany commercial fishing vessels ... on regular fishing trips, for the purpose of conducting research or observing operations ....
 To compare the text of section 1381(d), the statutory observer program, see note 6 supra.
 
 
 [8]
 Subsections (2) and (3) and section (g) provide:
 (2) Research and observation duties shall be carried out in such a manner as to minimize interference with commercial fishing operations. The navigator shall provide true vessel locations by latitude and longitude, accurate to the nearest minute, upon request by the observer. No owner, master, operator, or crew member of a certified vessel shall impair or in any way interfere with the research or observations being carried out.
 (3) Marine mammals killed during fishing operations which are accessible to crewmen and requested from the certificate holder or master by the observer shall be brought aboard the vessel and retained for biological processing, until released by the observer for return to the ocean. Whole marine mammals designated as biological specimens by the observer shall be retained in cold storage aboard the vessel until retrieved by authorized personnel of the National Marine Fisheries Service when the vessel returns to port for unloading.
 * * *
 (g) Penalties and rewards: Any person or vessel subject to the jurisdiction of the United States shall be subject to the penalties provided for under the Act for the conduct of fishing operations in violation of these regulations. The Secretary shall recommend to the Secretary of the Treasury that an amount equal to one-half of the fine incurred but not to exceed $2,500 be paid to any person who furnishes information which leads to a conviction for a violation of these regulations. Any officer, employee, or designated agent of the United States or of any State or local government who furnishes information or renders service in the performance of his official duties shall not be eligible for payment under this section.
 
 
 [50]
 C.F.R. Sec. 216.24(f), (g) (1981)
 
 
 [9]
 In its Declaration of Policy, Congress stated:
 [T]hat the protection and conservation of marine mammals is therefore necessary .... Marine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic, and it is the sense of the Congress that they should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management and that the primary objective of their management should be to maintain the health and stability of the marine ecosystem. Whenever consistent with this primary objective, it should be the goal to obtain an optimum sustainable population keeping in mind the optimum carrying capacity of the habitat.
 16 U.S.C. Sec. 1361 (1976-1982).
 
 
 [10]
 See, e.g., Hearings on Tuna-Porpoise Amendments Before the Subcomm. on Fisheries and Wildlife Conservation and the Environment of the House Comm. on Merchant Marine Fisheries, 94th Cong., 2d Sess., Ser. 29 (1976) at 352-53 (government compliance plan to court's order in Committee for Humane Legislation, Inc. v. Richardson, 414 F.Supp. 297 (D.D.C.) aff'd, 540 F.2d 1141 (D.C.Cir.1976)); Hearings on Oversight of the Tuna-Porpoise Problem Before the Subcomm. on Fisheries and Wildlife Conservation and the Environment of the House Comm. on Merchant Marine and Fisheries, 94th Cong., 2d Sess., Ser. 45 (1976) at 212 (remarks of Dr. White); id. at 223-24, 262 (remarks of Dr. Fox); Hearings on Reducing Porpoise Mortality Before the House Comm. on Merchant Marine and Fisheries, 95th Cong., 1st Sess. 3 (1977) at 209-10, 213, 216-17 (remarks of Dr. White); Hearings of Tuna-Porpoise Oversight Before the House Comm. on Merchant Marine and Fisheries, at 463 (remarks of Mr. Bonker); id. at 465-66 (remarks of Mr. McCloskey); Hearings on Oversight into the Marine Mammal Protection Act Before the Senate Comm. on Commerce, Science, and Transportation, 95th Cong., 1st Sess., Ser. 12 at 17 (1977) (remarks of Dr. White); Hearings on Marine Mammal Protection Act Authorization Before Subcomm. on Fisheries and Wildlife Conservation and the Environment of the House Comm. on Merchant Marine and Fisheries, 97th Cong., 1st Sess., Ser. 8 at 81-82 (1981) (remarks of Mr. Breaux and Mr. Burney); id. at 83-86 (remarks of Mr. Hertel and Mr. Burney)
 
 
 [11]
 See Pub.L. No. 97-58, 95 Stat. 979, codified at 16 U.S.C. Sec. 1371(a)(2) (1982)
 As one official explained, the observers started gathering compliance data in 1976. Hearings on Reducing Porpoise Mortality and Tuna-Porpoise Oversight Before the Subcomm. on Fisheries and Wildlife Conservation and the Environment of the Comm. on Merchant Marine and Fisheries, 95th Cong., 1st Sess. 465-66 (1977). The government compliance plan submitted in accordance with the order in Committee for Humane Legislation, Inc. v. Richardson, 540 F.2d 1141 (D.C.Cir.1976), was also the subject of 1977 oversight hearings, e.g., Hearings on Marine Mammal Oversight Before the Subcomm. on Fisheries and Wildlife Conservation and the Environment of the Comm. on Merchant Marine and Fisheries, 95th Cong., 1st Sess. 20-21 (1977) (use of observers to collect information on compliance is more effective than aircraft surveillance).
 
 
 [12]
 See note 6 supra
 
 
 [13]
 H.R. 6970 would have amended 16 U.S.C. Sec. 1381 to provide that an observer program for 400 ton capacity vessels should be established and maintained. The observer's responsibilities would have included determining compliance with MMPA regulations
 
 
 [14]
 Hearings on Reducing Porpoise Mortality and Tuna-Porpoise Oversight Before Subcomm. on Fisheries and Wildlife Conservation and the Environment of the Comm. on Merchant Marine and Fisheries, 95th Cong., 1st Sess., 455-56, 463, 465-66 (1977) (remarks of Dr. Fox and Mr. Frank)
 
 
 [15]
 Id. at 4631 (colloquy between Congressman Bonker and Mr. Frank, the NOAA administrator)
 
 
 [16]
 Id
 
 
 [17]
 As noted earlier, we have concluded that the observer program furthers substantial federal interests in protecting marine mammals. Congress was aware that an important national asset was being depleted by the commercial tuna fishing industry. Congress also determined that the Secretary needed broad rule-making power to adopt measures consistent with the MMPA to remedy the problem. The Secretary reasonably concluded that the observer program was necessary to further the regulatory scheme presented under the MMPA
 
 
 [1]
 Execution of process; arrest; search; seizure
 (d) Any person authorized by the Secretary to enforce this subchapter may execute any warrant or process issued by any officer or court of competent jurisdiction for the enforcement of this subchapter. Such person so authorized may, in addition to any other authority conferred by law--
 (1) with or without warrant or other process, arrest any person committing in his presence or view a violation of this subchapter or the regulations issued thereunder;
 (2) with a warrant or other process, or without a warrant if he has reasonable cause to believe that a vessel or other conveyance subject to the jurisdiction of the United States or any person on board is in violation of any provision of this subchapter or the regulations issued thereunder, search such vessel or conveyance and arrest such person;
 (3) seize the cargo of any vessel or other conveyance subject to the jurisdiction of the United States used or employed contrary to the provision of this subchapter or the regulations issued hereunder or which reasonably appears to have been so used or employed; and
 (4) seize, whenever and wherever found, all marine mammals and marine mammal products taken or retained in violation of this subchapter or the regulations issued thereunder and shall dispose of them in accordance with regulations prescribed by the Secretary.
 16 U.S.C. 1377(d).